CHARLES B. FARWELL et al.

v.

THE GREAT WESTERN TELEGRAPH COMPANY et al.

*Filed (on rehearing) at Ottawa June 13, 1896.*

1. CORPORATIONS—*in what manner stock subscriptions may be paid.* In the absence of agreement as to the manner of payment for capital stock, other than the mere act of subscription, a payment in money may be enforced; but, by special contract, labor, property or other valuable consideration may be taken as such payment, if no statute forbids.

2. SAME—*valuation of property taken for stock must be made in good faith.* Payment for stock made otherwise than with cash satisfies a subscription as effectually as money, where the valuation of the thing taken in payment is made in good faith and without fraud.

3. SAME—*when intervening bill to wind up will be treated as an original bill.* A bill of intervention to wind up a corporation, filed in a suit instituted to declare certain contracts of the corporation void and to obtain an accounting, is, to all intents and purposes, an original bill, and governed by the law in force when it was filed.

4. SAME—*assessment of stock in equity—what law governs as to parties.* A decree assessing corporate stock to pay debts, made under an intervening bill filed after the act of 1872 concerning corporations went into force, does not bind stockholders who were not parties, where the original bill, filed prior to said act, in no way called for such assessment.

5. SAME—*stockholder's remedy on refusal of corporation to act.* The actual or virtual refusal or neglect of a corporation to protect the rights of a stockholder entitles him to relief in equity.

6. SAME—*when a stockholder may sue without request to receiver.* A stockholder can maintain an action against a receiver and the corporation and others, to assert his rights, without a request that the receiver bring such suit, and his refusal to do so, where the receiver's conduct is equivalent to a refusal.

7. SAME—*misconduct of receiver in retaining creditor as counsel.* A sufficient excuse for stockholders to bring suit against a receiver and the corporation is shown where the receiver has retained as counsel the largest creditor of the corporation.

8. RECEIVERS—*of corporation—by what law governed.* A receivership to wind up a corporation in pursuance of an intervening bill filed after the act of 1872 concerning corporations went into force, is, on the question of necessary parties, governed by that act, notwithstanding the original bill, which did not call for a receiver, was filed prior thereto.

9. SAME—*cannot employ an attorney whose interests are hostile.* A receiver will not be permitted to employ as counsel one whose interests, in person or as attorney for another, are hostile to the interests represented by and the duties of such receiver.

10. SAME—*what is a sufficient leave of court to sue receiver.* An order of court entered in a pending cause, that "leave is hereby granted the complainants to amend their bill of complaint herein by changing the name of Edwin R. Bowen to Elias R. Bowen, and by making Elias R. Bowen, receiver, a party defendant," is a sufficient leave of court to sue the receiver named.

11. NOTICE—*when notice to agent is notice to principal.* Knowledge possessed by an agent in purchasing a fraudulent claim is to be imputed to the person for whom it is bought.

12. RES JUDICATA—*averment of facts insufficient to make former judgment a bar.* An averment as to a fraudulent contract, which is insufficient to bring it before the court, made in a bill which is held bad on demurrer, will not make the decision on such demurrer a bar to a subsequent bill for relief against fraud of which such contract formed a part.

13. SAME—*when judgment upon demurrer does not bar subsequent action.* Judgment upon demurrer by reason of a defective pleading does not bar a subsequent suit founded upon the same cause of action, when well pleaded.

14. LACHES—*not imputed to stockholders where there is concealed fraud.* Stockholders who are defrauded by a secret combination of the persons having control of the corporation are not chargeable with *laches* when they bring suit about one month after discovering the concealed fraud, and were not previously put on inquiry by facts known to them.

15. SAME—*relation of trust excuses failure to exercise diligence.* Failure to use diligence to discover fraud is excused where there is a relation of trust and confidence, rendering it the duty of the party committing the fraud to disclose the truth to the other.

16. LIMITATIONS—*statute does not run until fraud is discovered.* Until the discovery of the fraud, or the time when it could have been discovered by reasonable diligence, the Statute of Limitations against a suit therefor will not begin to run.

17. CONTRACTS—*mutuality between signers and beneficiaries—release.* There is no such mutuality between the signers of a contract for enforcing claims against a corporation, and certain other persons who it is agreed shall be saved harmless from loss by assessments, as to make such contract a release or a covenant not to sue.

18. JOINT LIABILITY—*parties to a fraud jointly and severally liable.* Parties to a fraudulent scheme whereby property of a corporation was sacrificed and the proceeds distributed, should, as a general rule, be held jointly and severally liable for the amount thereof.

19. SAME—*when general rule as to joint liability will not be applied.* Where the money to be recovered back, in equity, from wrong-doers, is mainly to be distributed amongst the perpetrators of the wrong, upon claims allowed and fixed before the wrongful con-spiracy was entered into, the general rule will not be applied, but each wrongdoer will, in that case, be compelled to return the amount he received, with interest.  (BAKER, J., dissenting.)

20. EQUITY—*relieves against fraudulent judgment.* Equity will re-lieve against judgments and decrees which were obtained by fraud.

21. SAME—*when equitable relief may be sought by original bill.* The pendency of a suit in which a bill of intervention might be filed will not prevent a new bill for relief, where new parties must be made and much additional matter be alleged and the facts and pleadings are complex.

22. SAME—*when equity will enjoin enforcement of decree.* The enforce-ment of a decree which is against conscience, or against which a party has had no opportunity to defend, or has been prevented from doing so by the fraud of the opposite party, without his fault, will be prevented by a court of equity.

23. ATTORNEYS AT LAW—*fees not allowed one representing hostile in-terest.* An attorney for a receiver will not be allowed fees where he is improperly employed, and represents hostile interests.

24. BILL OF REVIEW—*original bill in nature of—when filed without leave.* An original bill in the nature of a bill of review to impeach for fraud certain orders and decrees in pending cases may be enter-tained where the facts warrant it, and may be filed without leave of court first had.

25. PARTIES—*when creditors of corporation need not be parties.* Cred-itors are not indispensable parties to a bill by stockholders to set aside orders for assessments fraudulently obtained in a proceeding to which neither creditors nor stockholders were parties.

26. JUDGMENTS—*nunc pro tunc—when an appellate court may order.* Judgment *nunc pro tunc* may be ordered by an appellate tribunal on account of the death of parties, when reversing a judgment and remanding the cause.

*Farwell* v. *Great Western Telegraph Co.* 47 Ill. App. 579, reversed.

APPEAL from the Appellate Court for the First Dis-trict;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. LORIN C. COLLINS, Judge, presiding.

TENNEY, CHURCH & COFFEEN, for appellants:

The bill, and the facts proved under it, present a case properly cognizable by a court of equity.  *Griggs* v. *Gear,*

3 Gilm. 2; *Gooch* v. *Green*, 102 Ill. 507; 2 Pomeroy's Eq. Jur. sec. 919, p. 418; *Chicago Building Society* v. *Haas*, 111 Ill. 176; *Stickney* v. *Goudy*, 132 id. 213; *People ex rel.* v *Chicago*, 53 id. 424; *Nelson* v. *Rockwell*, 14 id. 375; *Babcock* v. *McCamant*, 53 id. 215; *Magee* v. *Magee*, 51 id. 500.

When the subject matter is one of which equity may take jurisdiction, then the objection to its exercise in the particular case is waived by filing an answer to the merits. *Dodge* v. *Wright*, 48 Ill. 382; *Gage* v. *Griffin*, 103 id. 41; *Theological Seminary* v. *Gage*, 103 id. 175; *Darby* v. *Dixon*, 4 Ill. App. 187; *Chicago* v. *Cameron*, 22 id. 91; *Knox County* v. *Davis*, 63 Ill. 405.

With the exception of Selah Reeve and the parties who allowed the case to go by default, all the defendants demurred to the bill without making any motion to dismiss it as improperly filed. This, of itself, admitted the bill was properly filed. *Griggs* v. *Gear*, 3 Gilm. 2; *Foreman* v. *Stickney*, 77 Ill. 575; *Horner* v. *Zimmerman*, 45 id. 14; *Lullman* v. *Barrett*, 18 Ill. App. 573; *Brill* v. *Stiles*, 35 Ill. 305.

The appellants, as stockholders of the Great Western Telegraph Company, have the right to maintain this suit in their own names. *Chicago* v. *Cameron*, 120 Ill. 447; 3 Pomeroy's Eq. Jur. sec. 1095; Angell & Ames on Corp. sec. 312; *Heath* v. *Railway Co.* 8 Blatchf. 394; *Brinkerhoff* v. *Bostwick*, 88 N. Y. 52.

Where the receiver refuses to bring suit, or is himself involved in the transaction, a stockholder may, for the benefit of himself and others, maintain a suit against the president and others for official neglect and mismanagement. *Ackerman* v. *Halsey*, 39 N. J. Eq. 356; *Furnace Co.* v. *Peters*, 40 Ohio St. 575; *Chicago* v. *Cameron*, 22 Ill. App. 91; *Covey* v. *Long*, 43 How. Pr. 492; High on Receivers, sec. 314; *Heffron* v. *Flower*, 35 Ill. App. 200; *Adams* v. *Wood*, 8 Cal. 306 ; *Bank* v. *Kent*, 43 Mich. 292 ; *Blair* v. *Railway Co.* 20 Fed. Rep. 348.

An attorney can never, even after the relation has terminated, purchase an interest in the subject matter of

the litigation which he was retained to defend, and hold it adversely to his client. Such purchase, even in the absence of actual fraud, is constructively fraudulent, and the purchase enures to the benefit of the client. Weeks on Attorneys, secs. 258, 222, 223, 277; *Baker* v. *Humphrey*, 101 U. S. 494; *Henry* v. *Raiman*, 25 Pa. St. 354; *Frank's Appeal*, 59 id. 190; *Galbraith* v. *Elder*, 6 Watts, 81; Kerr on Fraud and Mistake, 153; *Cloak and Suit Co.* v. *Dodge*, 120 Ind. 1; *Railway Co.* v. *Kelly*, 77 Ill. 426; *Bird* v. *Hughes*, 84 id. 174; *Chicago Building Society* v. *Haas*, 111 id. 176; *Haverty* v. *Haverty*, 35 Kan. 438; *Sutherland* v. *Reeve*, 41 Ill. App. 295.

Any evidence which clearly proves it to be against conscience to execute a judgment, of which the injured party could not have availed himself in a court of law, or of which he might have availed himself but was prevented by fraud or accident, unmixed with any negligence of himself or his agent, will justify an application to chancery. Freeman on Judgments, sec. 486; 2 Story's Eq. Jur. sec. 1575, note 4; 2 Pomeroy's Eq. Jur. sec. 919; *Hackley* v. *Draper*, 60 N. Y. 88; *Bowen* v. *Evans*, 2 H. L. Cas. 257; *Arrowsmith* v. *Gleason*, 129 U. S. 86; *Marshall* v. *Holmes*, 141 id. 589; *Johnson* v. *Waters*, 111 id. 640; *Shinkle* v. *Letcher*, 47 Ill. 216; *Higgins* v. *Curtis*, 82 id. 29; *Carrington* v. *Hollabird*, 17 Conn. 530.

The defendants who participated in this fraudulent scheme are jointly liable for the money received by their trustee. Their liability attached the moment Whiton received the money, and would not have been affected if he had never distributed it at all. 2 Pomeroy's Eq. Jur. secs. 1081, 660, note 1; *Attorney General* v. *Wilson*, 1 Cr. & Phil. Ch. 27; Bump on Fraud. Con. 613.

Successful concealment of a fraud for five years does not create a defense to it. *Michoud* v. *Girod*, 4 How. 561; *Caswell* v. *Caswell*, 120 Ill. 377; *Jones* v. *Lloyd*, 117 id. 597; *Harris* v. *McIntyre*, 118 id. 275; *Vigus* v. *O'Bannon*, 118 id. 339; *Greenman* v. *Greenman*, 107 id. 404 ; *Henry County* v. *Drainage Co.* 52 id. 299.

In cases of express trusts mere delay will not defeat a recovery unless the trustee has repudiated or disavowed the trust, and the disavowal is known to the *cestui que trust. Reynolds* v. *Sumner,* 126 Ill. 58.

The assessment of July 10, 1886, was fraudulent and void as to stockholders, because they were not parties to the proceeding. The Jones bill had no real connection with the original suit, and was in no sense a supplementary bill, although described as such. It was an original bill and a new suit. (*McDonald* v. *Asay,* 139 Ill. 123.) Regarded as an amendment, it introduced a new cause of action, and as to such amendments the suit is regarded as commenced from the time of the amendment. *Phelps* v. *Railroad Co.* 94 Ill. 548.

So as to an amendment introducing new parties. *Railway Co.* v. *Jenkins,* 103 Ill. 588; *Dunphy* v. *Riddle,* 86 id. 22; *Crowl* v. *Nagle,* id. 437; *Clark* v. *Manning,* 4 Ill. App. 649.

THOMAS J. SUTHERLAND, *pro se* and for certain appellees:

Whether this is a bill of review or a bill in the nature of a bill of review, it could not be filed except by a party to the case wherein the decree sought to be impeached was rendered, or by one in privity, and could not, in any event, be filed except to set aside a final decree. *Bates* v. *Telegraph Co.* 35 Ill. App. 255.

Where the corporation is barred the stockholder is barred. *Wallace* v. *Savings Bank,* 89 Tenn. 634.

The trustee of a mortgage represents the bondholders, and the bondholders cannot bring a bill of review if the trustee could not. *Credit Co.* v. *Railroad Co.* 15 Fed. Rep. 53.

A stockholder is an integral part of his corporation, and fully represented in court by it. *Hamilton* v. *Glenn,* 85 Va. 901, and 72 Md. 355; *Glenn* v. *Liggett,* 135 U. S. 543; *Porter* v. *Sabin,* 36 Fed. Rep. 476; *Telegraph Co.* v. *Gray,* 122 Ill. 637; *Bates* v. *Telegraph Co.* 134 id. 549; *Coalfield Co.* v. *Peck,* 98 id. 143.

The doctrine of *res judicata* concludes as to every ground that was, or might have been, urged in support of the relief prayed. *Ruegger* v. *Railroad Co.* 103 Ill. 45.

It would be wrong, in case the shareholders were unsuccessful, to allow the corporation (or a stockholder) to renew the litigation in another suit involving precisely the same subject matter. Green's Brice's Ultra Vires, 571; *Davenport* v. *Dows*, 18 Wall. 627.

The rule applied in the *Bates case, supra*, should be applied here, according to the rule of *stare decisis*. *Marshall* v. *Silliman*, 61 Ill. 221; *McCormick* v. *Bauer*, 122 id. 579.

The right of action would have been transferred to the receiver even if the alleged fraudulent acts had been committed against the corporation before his appointment. *Fisher* v. *Andrews*, 37 Hun, 178; *Curtis* v. *Leavitt*, 15 N.Y. 44; *Gillett* v. *Moody*, 3 id. 479; *Wallace* v. *Savings Bank*, 89 Tenn. 637; *Osgood* v. *Laytin*, 48 Barb. 464.

It is the duty of the receiver to collect and preserve the fund, and all rights of action in respect thereto are vested in him. 2 Morawetz, secs. 867, 868; 2 Spelling on Corp. secs. 861, 864, 875; *Manf. Co.* v. *Langdon*, 44 Minn. 39.

Leave to sue the receiver must first be obtained. *Barton* v. *Barbour*, 104 U. S. 128.

The law is, that the stockholder's right of action does not arise or come into existence until the conditions are such that it is impossible that justice can be done by a proceeding in the name of and by the corporation. *Greaves* v. *Gouge*, 69 N. Y. 157.

Before the stockholder can get into court he must, by his complaint, establish his right by showing demand and refusal, or culpability of directors. *Eschweiler* v. *Stowell*, 78 Wis. 319.

There is no cause of action unless the condition is shown to exist. *Doud* v. *Railroad Co.* 65 Wis. 113; *Holton* v. *Railway Co.* 138 Pa. St. 111; *Wallace* v. *Bank*, 89 Tenn. 635; *Hawes* v. *Oakland*, 104 U. S. 450; *Tutweiler* v. *Tuscaloosa C. and L. Co.* 89 Ala. 395.

The alleged wrongdoers are persons disconnected from the company.  In no contingency does a stockholder, in the first instance, have the right to intervene or meddle with such litigation.  *Coalfield Co.* v. *Peck*, 98 Ill. 143; *Talbott* v. *Scripps*, 31 Mich. 269; *Samuel* v. *Holladay*, 1 Woolw. 406; *Wallace* v. *Bank*, 89 Tenn. 637; *Nathan* v. *Tompkins*, 82 Ala. 445; *United States* v. *Railroad Co.* 98 U. S. 398.

A mere fraudulent intent, unaccompanied by any injurious act, is not the subject of judicial cognizance.  *Clarke* v. *White*, 12 Pet. 196; *People* v. *Healy*, 128 Ill. 16; *Bell* v. *Johnson*, 111 id. 379; *Sterling Gas Co.* v. *Higby*, 134 id. 568; *Fowler* v. *Loomis*, 37 Ill. App. 365; *Williams* v. *Hagood*, 98 U. S. 74; *Allen* v. *Curtis*, 26 Conn. 462; *Hutchins* v. *Hutchins*, 7 Hill, 107.

The decrees complained of were all rendered more than eight years before the bill was filed, and appellants are met by the same statute of five years which applies to writs of error, and is held to be equally applicable to bills of review and those in the nature of such bills. *Bell* v. *Johnson*, 111 Ill. 379.

The limitation applicable to the suit of the corporation at law is equally applicable to the suit of the stockholder upon the corporate right of action in equity. Morawetz on Corp. sec. 271; Cook on Corp. Law, sec. 701; *Gadbold* v. *Bank*, 11 Ala. 191; *Williams* v. *Hilliard*, 38 N. J. Eq. 383; *Spering's Appeal*, 71 Pa. St. 11; *Brinkerhoff* v. *Bostwick*, 99 N. Y. 193.

In bills of review the complainant must purge himself of *laches.*  *Sloan* v. *Sloan*, 102 Ill. 581; *Speidel* v. *Henrici*, 15 Fed. Rep. 756; *Badger* v. *Badger*, 2 Wall. 95; *Marsh* v. *Pridmore*, 21 id. 184; *Brown* v. *Buena Vista*, 95 U. S. 160; *Bates* v. *Gillett*, 132 Ill. 303; *Eberstein* v. *Willets*, 134 id. 105; *Nichols* v. *Otto*, 132 id. 99; *Gibbons* v. *Hoag*, 95 id. 69.

Additional authorities cited upon rehearing:

As opposed to the jurisdiction of the circuit court to entertain the complainants' bill, and to thus review and revise here the proceedings of the pending Terwilliger chancery suit, and transfer the jurisdiction of the cir-

cuit court in that case to the court in this suit, see *Shepard* v. *Speer*, 140 Ill. 238, and 41 Ill. App. 212, and cases cited; *Newman* v. *Bank*, 156 Ill. 530; *Field* v. *Ridgely*, 116 id. 424; *Hanchett* v. *Waterbury*, 115 id. 220; *Wilson* v. *Aaron*, 132 id. 238; *Bates* v. *Telegraph Co.* 35 Ill. App. 254, and 134 Ill. 536; *Farwell* v. *Telegraph Co.* 47 Ill. App. 579; *Hamilton* v. *Glenn*, 72 Md. 349; *Glenn* v. *Williams*, 60 id. 93; *Insurance Co.* v. *Sloan*, 70 Wis. 611; *Platto* v. *Demster*, 22 id. 482; *Sanger* v. *Upton*, 91 U. S. 56; *Nougue* v. *Clapp*, 101 id. 553; *Graham* v. *Railroad Co.* 118 id. 161; *Stewart* v. *Lay*, 45 Iowa, 612; *Grant* v. *Quick*, 5 Sandf. 612; *Coon* v. *Seymour*, 71 Wis. 390; *Pond* v. *Harwood*, 139 N. Y. 111; *Parish* v. *Marvin*, 15 Wis. 274; *Schell* v. *Railway Co.* 51 Barb. 368.

In support of the *res judicata* of decision of the Supreme Court in *Bates* v. *Great Western Telegraph Co.* 134 Ill. 536, and also to the effect that the decision of the Supreme Court in *Great Western Telegraph Co.* v. *Gray*, 122 Ill. 630, is beyond recall by this court and *res judicata* as to the corporation and every stockholder, see *Town of Lyons* v. *Cooledge*, 89 Ill. 536; *Garrick* v. *Chamberlin*, 97 id. 639; *Messenger* v. *Insurance Co.* 59 Fed. Rep. 416; *Alley* v. *Nott*, 111 U. S. 473; *Bissell* v. *Spring Valley*, 124 id. 232; *Goodman* v. *Litchfield*, 59 Iowa, 226; *Litch* v. *Clinch*, 136 Ill. 425; *Haley* v. *Breeze*, 144 U. S. 131; *Johnson Co.* v. *Wharton*, 152 id. 252; *Bailey* v. *Bailey*, 115 Ill. 567; *Bennitt* v. *Mining Co.* 119 id. 9; *Mix* v. *People*, 116 id. 265; *Knowlton* v. *Hanbury*, 117 id. 471; *Jenkins* v. *Bank*, 111 id. 462; *Hamilton* v. *Glenn*, 85 Va. 901, and 72 Md. 351; 2 Van Fleet on Former Adjudications, 98; *Willoughby* v. *Railway Co.* 50 N. J. Eq. 656; *Bank* v. *Bank*, 123 Ill. 517; *Harmon* v. *Auditor*, 123 id. 122; *McCormick* v. *Bauer*, 122 id. 579; *Hawley* v. *Simmons*, 102 id. 115; *Honore* v. *Wilshire*, 109 id. 108; *Mueller* v. *Henning*, 102 id. 647; *Maloney* v. *Dewey*, 127 id. 402; *Newberry* v. *Blatchford*, 106 id. 584.

JOHN M. HAMILTON, for appellee Franklin D. Gray.

BLACK & FITZGERALD, for appellees the Great Western Telegraph Company and Frank A. Helmer, receiver.

WILLIAM J. AMMEN, for appellee George F. Harding.

CHARLES E. POPE, for appellee Selah Reeve.

Mr. JUSTICE PHILLIPS delivered the opinion of the court:

Charles B. Farwell, and four other stockholders in the corporation known as the Great Western Telegraph Company, on the third day of October, 1888, filed in the circuit court of Cook county a bill in chancery, in behalf of themselves and all other stockholders in said company who would come in and contribute to the expenses of the suit, against the Great Western Telegraph Company, Selah Reeve, David A. Gage, Josiah Snow, Jeremiah M. Terwilliger, Judson M. W. Jones, Thomas J. Sutherland, Adelaide K. Sutherland, George F. Harding, John Clark Hilton, Franklin D. Gray, John J. McClellan and Edwin R. Bowen, which bill was subsequently amended by changing the name of Edwin R. Bowen to Elias R. Bowen, and also by making Elias R. Bowen, receiver, party defendant.

From the record it appears that on the second day of December, 1867, the Great Western Telegraph Company, a corporation, was organized under an act of the General Assembly of the State of Illinois, approved February 9, 1849, entitled "An act for the establishment of telegraphs." The principal office of this corporation was located in the city of Chicago, and its capital stock consisted of 120,000 shares of $25 each, which was subscribed for and taken, at the time of its organization, by the following named persons, who subscribed for the number of shares, and amounting as follows:

Selah Reeve, 117,897 shares.......................$2,947,425
Hasbrouck Reeve, 100 shares.........................  2,500
David A. Gage, 1000 shares..........................  25,000
Josiah A. Snow, 1000 shares.........................  25,000
Dwight Johnson, 1 share.............................      25
John Hall, 1 share..................................      25
Valentine F. Gardner, 1 share.......................      25

The full number of shares being subscribed, a liability existed on the part of each subscriber to the company for the par value thereof, respectively, for the amount taken.

It is elementary that stock may be issued by subscription made in writing, or even by an equivalent act for which cash is to be paid for the stock so subscribed for, or it may be issued to be paid for in property or labor, or both, or issued as a stock dividend. In the organization of a corporation the stock must be subscribed for to be paid in cash, labor or property. In the absence of an agreement as to the manner of payment, by the mere act of subscription alone a money payment may be enforced. There have arisen much controversy and litigation as to whether payment for the issue of stock may be made by labor, property, work under contract, or valuable consideration other than money. It is not now questioned that it may be done, in the absence of statutory provisions requiring payment to be made in cash. (*Wyman* v. *Am. Pow. Co.* 62 Mass. 168; *Haydon* v. *Atlanta Cotton Factory*, 61 Ga. 234; *Reichwald* v. *Commercial Hotel Co.* 106 Ill. 439; *Liebe* v. *Knapp*, 79 Mo. 22; *Clark* v. *Farrington*, 11 Wis. 306; *Railroad Co.* v. *Cramer*, 23 Ind. 490; *Railroad Co.* v. *Hickman*, 28 Pa. St. 318.) But when such payment is made otherwise than with cash it is necessary that the property or service shall be reasonably worth the sum at which it is so taken. Where a valuation is made in good faith and without fraud, the payment by property or labor at such valuation is as effectual in satisfying the liability for the subscription as a payment in money of the same amount.

Whether shares of stock, when the certificates are sold, may be treated as fully paid by the purchaser it is not necessary to determine in this case, as adjudications of this court with reference to this corporation have determined, incidentally, that question, and the statute now in force also determines that question.

On the shares of stock subscribed by the persons who sought to form this corporation no money was paid by

any of them.  Selah Reeve, who subscribed for the greater
part of it, was insolvent, and a few months thereafter,
on his own petition, was discharged as a bankrupt.  On
the 13th of January, 1868, the corporation elected as a
board of directors, Gage, Snow, Hall, Hasbrouck Reeve
and Selah Reeve.  Gage was elected president.  Selah
Reeve resigned as director, and on the 25th of March,
1868, entered into a written contract, through Gage, as
president, for the construction by him of 2000 miles of
telegraph line, on routes to be designated by the com-
pany.  No time for the commencement of the work or its
completion, nor compensation per mile, was fixed.  The
agreement contained this covenant: "In consideration
of the aforesaid covenants and agreements, to be faith-
fully kept and performed by the said contractor, the said
Great Western Telegraph Company doth hereby cove-
nant and agree, to and with the said Selah Reeve, to
issue and deliver to him certificates for shares in the
capital stock of the Great Western Telegraph Company,
to-wit, 120,000 shares, on the execution of this agreement,
the said shares to be owned and represented by the said
Selah Reeve in all meetings of the shareholders of said
company until such time as the same shall be subscribed
and fully paid for by other parties."

We quote from *Terwilliger* v. *Great Western Telegraph Co.*
59 Ill. 249, a further statement of facts: "Contempora-
neously with the execution of this agreement Reeve
assigned to Snow, the secretary and treasurer of the
company, the 117,897 shares originally subscribed by
him, in trust, to sell the same to such persons as either
he or the company could procure to subscribe to the
stock, at the rate of $10 per share, and to pay over the
proceeds to Reeve under his contract with the company,
or any contract supplementary thereto.  The next day
a supplementary agreement was made and executed be-
tween Reeve, the company, and Snow, as trustee.  By
this agreement an irrevocable authority is given to the

trustee to sell stock, through the agents of the company, to subscribers, at $10 per share, the company paying to the trustee the money thus received, less a commission of fifty cents per share to be allowed to agents, and the trustee paying it to Reeve as fast as he should construct the line, in sections of ten miles each, to the satisfaction of the company. This contract also specifies the rate to be paid per mile for the construction of the line. The agreement also provides that the trustee shall represent all the stock assigned to him by Reeve, except so much as may be subscribed and paid for by other persons. The rate of compensation to be paid Reeve was, as shown by the evidence, largely in excess of the cost of construction. The next step of these parties was to put their scheme in a position to command the public confidence, and enable them to procure subscriptions and money. To this end they proceeded, on the 30th of March,—four days after the execution of the final contract between the company and Reeve,—to elect twenty-two additional directors. These new directors were selected from well known citizens and men of business in Chicago, but they were not stockholders. Some of them afterward did subscribe, but the greater part refused to do so or to act as directors. Of the few who subscribed, we infer, from the record, only one paid any money on his subscription. The parties conducting this scheme having thus placed themselves in a position to impose upon the public by the unauthorized use of names that would command confidence, proceeded to issue a prospectus, setting forth the organization of the company, with these names as directors, stating that the company was established under State laws and an act of Congress, for the purpose of cheapening telegraphic correspondence in the West, and that the stock would be apportioned, according to population, to the cities and villages of Illinois, Wisconsin, Minnesota, Michigan, Iowa, Indiana, Missouri, Kansas and Nebraska. The prospectus further stated that

the stock was $3,000,000, divided into shares of $25 each, and that on the payment of $10 on each share a certificate of stock for $25 would be issued and no further assessments would be made.   Prior to the election of the twenty-two new directors the old board had adopted by-laws.   The first of these by-laws provided that the first annual meeting of the stockholders of the company should be held within ninety days after 2000 miles of the .company's lines had been equipped with wires.   Another by-law provided for the election of directors whenever any number of stockholders holding a majority of the shares shall present a written request, addressed to the president, for a meeting of shareholders for that purpose. The prospectus did not disclose the fact that a contract for the construction of 2000 miles of line had already been made, and that all the stock, except an insignificant portion, had been placed, without payment, in the hands of a trustee of the contractor, with power to represent the same.   Neither did the persons who were induced to become subscribers know that until about $1,500,000 should be subscribed their money could be controlled by this trustee, and that they would have no voice in the management of the company, even by voting for directors, until 2000 miles of line should be constructed, unless the trustee should choose to have an election called.   By means of this prospectus and the solicitation of agents, who received a commission, large amounts of money were subscribed.   As the money came in Reeve began to construct lines under his contract.   Another prospectus was issued in 1869, in which it is stated that 333 miles of line were in operation on the 31st of July, 1869, that the company owed no debt, and that the net earnings of the preceding quarter on the Milwaukee division were at the rate of eighteen per cent on its cost.   This prospectus further stated that there were already over two thousand subscribers to the stock among business men over various routes.   The evidence shows that up to the 30th of June,

1870, Reeve had built 417½ miles of line, for which he had been paid $126,550.90, and that he had also been paid $25,000 on work not completed."

After stating the history of the organization, this court in that case then determined that the contract between Reeve and the corporation was fraudulent, and held it should be set aside, and held further that the original subscription was a sham, and fictitious merely, and the *bona fide* stockholders are those who purchased the stock claimed to be owned by Reeve, but who, by the manner of their purchase, became original subscribers to the capital stock. The opinion in that case, in remanding the cause, gave full directions, which it is not necessary to here quote. Those purchasers of this stock who, it was held in that case, became original stockholders, became such by signing a contract of subscription.

The bill sets out a copy of the contract for subscription signed by the stockholders who procured the Reeve stock, and is the same as that set out in the opinion in *Great Western Telegraph Co.* v. *Gray*, 122 Ill. 630, and *Bates* v. *Great Western Telegraph Co.* 134 id. 536, and is as follows:

"Capital, $3,000,000; shares, $25; assessments not to exceed $10 on a share. Subscription list for the capital stock of the Great Western Telegraph Company.

"We, the subscribers hereunto, for value received, severally, but not jointly, agree to take the number of shares in the capital stock of the Great Western Telegraph Company placed opposite our respective names, and pay for the same in installments, to-wit: Five per cent on amount paid in, and the balance as the directors, from time to time, may order. In consideration thereof the Great Western Telegraph Company agree that when forty per cent of the par value of the shares shall have been paid under such orders, and the installment receipts therefor surrendered to the company, the number of shares severally subscribed by the undersigned shall be issued to them as full paid stock of said company.

" . . . . . . . . . . . . . . . . . . is appointed agent to solicit stock, and receive only the first installment of five per cent (fifty cents on a share) at the time of subscribing."

When the *Terwilliger case* was remanded by this court to the circuit court of Cook county, a decree was entered in accordance with the decision of this court. That decree was entered November 16, 1872, and sets aside and declares void the contracts between the corporation and Selah Reeve for the construction of the lines; refers the case to Chase, as master, to ascertain the names and residence of the subscribers to stock and the amount paid by them; requires the corporation to issue certificates of stock to all subscribers who have paid money, for as many shares as they are entitled to, reckoning forty per cent on $25 as giving title to a share; orders that the president and secretary call a meeting of such stockholders for the election of a new board of directors; that unless such newly elected board make an amicable settlement with Selah Reeve, satisfactory to the court, the court will ascertain, as nearly as possible, the cost of the lines constructed by Reeve, and allow reasonable compensation therefor, and make a decree against him for the balance, etc., and that the complainants be at liberty to apply for such further order, etc.

The corporation was re-organized by the election of a new board of directors, and being unable to make an amicable settlement with Reeve, on March 5, 1873, filed its petition against him for an accounting, and that was referred to Chase, as master, to take proof and state the account. That order of reference was entered on the 8th day of March, 1873. On February 9, 1874, by intervention, a bill was filed in that cause by J. M. W. Jones and others, who were stockholders, and who seem to have intervened for that purpose. The purpose of their bill was to wind up the affairs of the corporation, etc.

On the 7th of October, 1874, one Almon Kidder, a judgment creditor of the corporation, filed an original bill against and sought to wind up the affairs of the Great Western Telegraph Company, and asked for the appointment of a receiver. The order of reference on the petition

of the corporation against Reeve for an accounting was still pending before the master, and on the 21st of September, 1874, Reeve filed his cross-bill, in which it was averred that he had constructed 1400 miles of additional lines, and he prayed an accounting. The original bill filed by Terwilliger against the corporation did not aver its insolvency or allege any existing indebtedness, nor did it contain any averment to authorize the winding up of the affairs of that body. Neither did it make defendants any of the persons who purchased the Reeve stock under the above stated contract, and who were held by this court to be the *bona fide* stockholders. Neither did the petition of the corporation for an accounting against Reeve, the intervening bill of Jones, nor the original bill of Kidder, make any of the purchasers of what was formerly the Reeve stock parties defendant, except the officers of the company. The intervening bill of Jones and others, and the original bill of Kidder, contained allegations that were sufficient to authorize the court to appoint a receiver and wind up the affairs of the corporation.

Prior to the re-organization of the corporation the Commercial National Bank acquired a claim which, with interest, amounted to about $15,000, and John Clark Hilton had a claim which, with interest, amounted to about $30,000. Both of these claims had been reduced to judgments at law, and were proven before Chase, as master, and were based on notes made by the corporation before its re-organization and whilst it was under the control of the first board of directors. These notes were for no other consideration than for money alleged to be due Reeve for building the lines under his original contract.

George L. Otis was treasurer of the corporation from about May 1, 1871, until in 1872, and was assistant cashier of the bank. The notes on which the bank's claim and Hilton's claim were so allowed were made by the corporation, by Otis, treasurer. During the period of time that

Otis was treasurer he made notes in the name of the corporation, with dates and amounts as follows: May 2, 1872, $2650; May 13, 1872, $15,100; May 24, 1872, $2650; May 30, 1872, $1000; June 22, 1872, $3000; June 6, 1872, $6603.16; June 6, 1872, $6603.16; June 6, 1872, $6603.16; June 30, 1872, $1000; August 1, 1872, $809.77. All those dated in May were made payable to the Commercial National Bank, that of June 30 was made payable to Gage, and all the others were made payable to Reeve, and were made to pay for work done under his contract, and no other consideration was received by the company. The facts as to these notes are shown by the bill and answers in the case of Great Western Telegraph Company against Reeve, Gage, Snow, Hilton, Commercial National Bank, Otis and others, filed in the circuit court of Cook county on February 6, 1874, which bill was afterward dismissed for non-compliance with the rule to file bond for costs.

On October 7, 1875, a stipulation was entered into, which was signed by Selah Reeve, by Thomas J. Sutherland, his attorney; the corporation, by Harding, McCoy & Pratt, its attorneys; the Commercial National Bank, by Sleeper & Whiton, its attorneys; John Clark Hilton, by E. A. Small, his attorney; and the complainants in the supplemental bill, by Bennett, Kretzinger & Veeder, their attorneys. This stipulation was filed in the cause of the intervening bill of Jones and others, and under it, and in accordance with its terms, a receiver was appointed and an order of reference made, requiring the master should give notice to creditors to present their claims, and that sale of the corporate property be made, etc. Under that stipulation O. H. Horton was appointed receiver, and he continued to act as such until the 31st day of May, 1879, when he resigned, and Thomas S. McClelland was appointed his successor. Under that stipulation a reference was made to Hiram M. Chase to take testimony.

Chase, the master, to whom the matter of accounting, on the petition of the corporation, as against Reeve, had been referred, on December 26, 1874, made a report find-ing there was due Reeve $55,958.99.  That report recites that George F. Harding appeared for the corporation and Sutherland for Reeve.  The corporation claimed that Reeve should be charged with the amounts paid by sub-scribers of the stock, amounting to $378,000.  The master held he was not to be charged with anything except what he had personally received, and that the $126,550.90 and the $25,000 mentioned in the opinion of this court in the *Terwilliger case* was not paid him by subscribers, but by the corporation.  The master on that point held: "The $126,550.90 and the $25,000, mentioned by the Supreme Court as having been paid up to June 30, 1870, was not paid him by subscribers, but by the company, as appears by the vouchers given by him.  Reeve claims that he had nothing to do with building the first 417½ miles of com-pleted lines and the uncompleted lines mentioned in the opinion; that he was in Canada at that time, and on his return gave the vouchers, because advised by Snow that the amount had actually been expended in building the lines.  Upon this question Reeve has had his day in court. His answer is on file in this cause, claiming pay for the construction.  He has submitted all his claims to the court, and by the decision is only to be credited, as against the $151,550.90, with the cost of the 417½ miles lines com-pleted and the lines partially completed," etc.  The ac-count is then stated, and the cost of building the lines, ect., is found to be $343,743.22 and the amount received by Reeve is found to be $293,352.39, leaving a balance due Reeve of $50,390.83, which, with interest, (found to be $5568.16,) makes the total amount due Reeve $55,958.99.

To this report the Great Western Telegraph Company filed exceptions, as did also Kidder, their exceptions being similar.  Of these, the following are to be consid-ered in this connection:

"*First*—That the master states the company took the affirmative of the issue.

"*Second*—That the master fails to report the amount of money received by Reeve's agents, trustees or other employees, as required by the order of reference.

"*Seventh*—The master failed to charge Reeve with all the moneys received by him and by his agents and trustees, as directed by the order of reference, and failed to charge him with large amounts of money received by Snow, his trustee; that the evidence shows Reeve should be charged with at least $400,000, while the master charges him with less than $200,000."

Reeve also filed exceptions, and those important to be considered are the following:

"*Second*—That the master stated that the amount fixed by the Supreme Court as Reeve's receipts up to June 30, 1870, is *res judicata.*

"*Third*—That the master stated that the Supreme Court has adjudicated as to the amount of money received and the lines built by Reeve up to June 30, 1870.

"*Fourth*—That the master stated that Reeve had had his day in court as to the lines stated by the Supreme Court to have been built and the money received by him up to June 30, 1870, and has submitted all his claims to the court, and by the decision of the Supreme Court is to be credited, as against the $151,550.90, with the cost of 417½ miles of constructed lines and the lines partially constructed, and with reasonable compensation for his time and labor, whereas the master should have found that it was not an issue before the Supreme Court as to how many miles of lines or parts of lines Reeve had constructed or how much money he had received up to June 30, 1870, and that what the Supreme Court said on that subject is not *res judicata*, and that Reeve has not had his day in court on those issues, but they were issues before the master in the accounting, and that he is not, and ought not to be, by the decision of the Supreme Court,

charged with the said $151,550.90 mentioned in its decision, or to be credited, as against that sum, with the cost of 417½ miles of constructed and the lines partially constructed prior to June 30, 1870, with reasonable compensation for his time and labor; that the master has not found that Reeve had nothing whatever to do with the building of the 417½ miles completed and 267 miles of uncompleted lines constructed prior to June 30, 1870, and referred to in the decision of the Supreme Court, but that the same were built by the company; that Reeve did not receive from the company, or any one else, any part of the said $151,550.90, but the company used that sum itself in building the lines and paying its expenses, and that said sum, and also the 417½ miles of completed and 267 miles of uncompleted lines, ought not to form any part of the accounting."

The exceptions were argued and taken under advisement by circuit Judge Farwell some time in 1876. Prior to this time an order had been entered confirming the report of the master as to almost all the claims except that of Reeve, the nature and character of which are unnecessary to be here stated. Horton had, early in his receivership, made a lease of the property of the corporation to the Western Union Telegraph Company, and that lease contained provisions by which the Western Union Telegraph Company acquired a lien on the leased property for any moneys expended thereon.

On October 1, 1878, Judge Farwell entered an interlocutory decree on the exceptions taken under advisement by him. This order recites that the cause came on to be heard on the report of Chase, the exceptions thereto of Reeve, filed January 11, 1875, and of the Great Western Telegraph Company and Almon Kidder, filed January 14, 1875; that after hearing the report, the exceptions, and the arguments of Bennett, Harding, Pratt and Sutherland, it is ordered that of the exceptions of Reeve those numbered 2 and 3, and the first part of exception num-

bered 4, concluding with the words "up to June 30, 1870," be allowed, and that the remainder of the fourth exception, beginning with the words, "and that he is not, and ought not to be, by the decision of the Supreme Court, charged with said $151,550.90," and all other of said exceptions be overruled; that the exceptions of the Great Western Telegraph Company and of Almon Kidder numbered 1, 2 and 7 be allowed and the others overruled; that the report and finding of the master, except as to such parts as are excepted to and the exceptions allowed, as above stated, be approved and confirmed; that they be referred to Horatio L. Wait, master, the successor of Chase, deceased, to state the account in accordance with the order of reference made March 8, 1873, and in accordance with the ruling of this court upon said report and exceptions; and that in stating such account he allow Reeve, as the cost of building the lines, the amount found by Chase, and that he charge Reeve with all moneys received by him, or by the company, or by any officers, agents or employees of them or either of them, in payment or part payment for stock before the possession and control of the property and business of the company passed out of their hands, pursuant to the decision of the Supreme Court and the order of this court made in accordance therewith on November 16, 1872. To so much of such order as sustains the second, third and part of the fourth of his exceptions, Reeve excepted.

The effect of thus sustaining the exceptions to the report made by Reeve was, that the decision in the *Terwilliger case* was not *res judicata* as to an accounting between Reeve and the corporation. By sustaining the second and seventh exceptions filed by the corporation it was substantially held that in stating the account Reeve should be charged with all moneys which came to his hands or which were received by his agents, trustees and other employees, specifying particularly that he should be charged with money received by Snow, as his

trustee. This order then, by its terms, directs Wait to state the account in accordance with the order of reference made March 8, 1873. That order, by its express terms, directed the master, in stating the account, to state "the account between the company and Reeve of all money, notes, stock or other property of the company received by Reeve, his agent, trustee or other employees for him, and of all moneys paid out by Reeve for the company, and showing, generally, the state of the account between Reeve and the company."

During this extended litigation Thomas J. Sutherland was the attorney for Reeve, and he also acted as the attorney for the receiver, and at a later period had an order entered that the accounting for Reeve should be carried on in his name and for his benefit. From an early period in this litigation Harding, McCoy & Pratt, of which firm George F. Harding was a member, became the attorneys of the corporation, and were so of record till late in 1879, and by no act of record was their appearance as such attorneys ever withdrawn. It is shown Harding was of record and acted as attorney for the corporation until late in 1879. While such attorney he acquired certain bonds of the corporation of the face value of $4500, and also had a claim for legal services, which, it is alleged, is the same claim which was paid to his partners. John I. Bennett had a claim against the corporation for legal services, he having at one time acted as attorney for it. Franklin D. Gray was a stockholder in the corporation, and had bought the claim of David A. Gage above mentioned, which is alleged to be fraudulent. That claim was purchased from Gage by Sutherland, for Gray, at a price of from $3000 to $5000.

The bill filed by the corporation against Reeve, Gage, Hilton, the Commercial National Bank and others, which was dismissed for failure to file cost bond, was not dismissed until October 7, 1879. The claims of Hilton, of Gage, of the Commercial National Bank and of Reeve

were in litigation at this time.   The accounting between
the corporation and Reeve, referred to Wait, quietly
slumbered, when an instrument in writing, purporting to
be of date June 18, 1879, was executed, as follows:

"This agreement, made and entered into at the city of
Chicago, in the county of Cook and State of Illinois, this
18th day of June, A. D. 1879, by and between the following
named parties, to-wit:   The Commercial National Bank
of Chicago, John Clark Hilton, George F. Harding, John
I. Bennett, Thomas J. Sutherland and Franklin D. Gray,
all being resident in the said city of Chicago:

"*Witnesseth:*   That whereas, the said parties are the
owners and controllers of certain claims, demands, judg-
ments and decrees against the Great Western Telegraph
Company, a corporation duly organized, etc., and in forms
and amounts as follows, to-wit:   The said Commercial Na-
tional Bank a claim, according as the same was proved
before Hiram M. Chase, master in chancery, under and
in pursuance of a decree of reference made in the matter
of said company, and the claims against the same subse-
quent to the appointment of O. H. Horton as receiver of
the said company, and as also evidenced in certain suits
and judgments in the courts of record in said Chicago,
and which claim is now, including interest, about the
sum of fifteen thousand dollars ($15,000); the said John
Clark Hilton a claim against said company, and now in
the form of judgment heretofore rendered in his favor
and against said company in the court of record in said
Chicago, and also according as the same was proved be-
fore said master under and in pursuance of said reference
and before said master, and which amounts now, includ-
ing interest, to about the sum of thirty thousand dollars
($30,000); the said George F. Harding a claim against
said company, consisting as follows, viz., the bonds of
said company amounting to the face value of four thou-
sand five hundred dollars ($4500), and a two-fifths (2-5)
interest and part in and to the late firm of Harding,

161—35

McCoy & Pratt against said company, as proved before said master in pursuance of said reference, and reported by said master to the circuit court of Cook county, in the State of Illinois, and allowed by said court upon the said report of the said master, and being the sum of about twenty-six hundred dollars ($2600), the full claim, the sum total of said Harding's claim against said company being about eight thousand dollars ($8000); the said John I. Bennett a claim against said company, as proved against said company before said master on said reference, and as afterward allowed by the said court, the sum allowed being about twenty-nine hundred dollars ($2900), and the amount now due, including interest, being the sum of three thousand eight hundred dollars ($3800); the said Thomas J. Sutherland a claim against said company, now in process of determination in said court in an accounting between one Selah Reeve and said company, and which claim has been reported upon by said master in favor of said Reeve and against said company, and which, according to said report, now amounts, including interest, to the sum of about seventy-four thousand dollars ($74,000), the said claim being now assigned to and controlled by the said Sutherland, who has full authority to act regarding the same; the said Franklin D. Gray a claim against said company, as follows, to-wit, viz., the claim of David A. Gage against said company, as proved before said master on said reference and reported by him to said court, the said claim as reported being about thirty-five hundred dollars ($3500), and amounting, according to said report, at the present time, including interest, to the sum of about four thousand five hundred dollars ($4500); and whereas, the said parties have full power and authority to sell, transfer and assign the said respective claims, demands, judgments and decrees above described and set forth:

"Now, therefore, it is agreed hereby, and by and between the several parties hereto, each with the other,

and in consideration of the covenants, agreements and undertakings of the said parties, respectively, as hereinafter set forth, as follows:

"*First*—The said claims, demands, bonds, judgments, decrees, etc., shall be assigned and transferred, with all proper evidences of title, immediately upon execution of this agreement, to some person to be selected by a majority of the parties hereto, as trustee, who shall hold the same, and collect all money paid by or on account of said company, or the receiver thereof, toward the liquidation and payment of the said claims, demands, judgments, decrees, bonds, etc., and all interest thereon, and hold the same in trust for the said parties hereto, and pay the same to them, respectively, upon demand, according as they are respectively entitled thereto by virtue of the terms of this agreement as hereinafter set forth, and also, if deemed advisable by the parties hereto, the said trustee may bid for and buy the said property of the said company according to the instructions of the parties hereto, and shall hold the same for their benefit and as hereinafter set forth. The parties hereto shall have the power to select a successor in trust, in the same manner as the original trustee shall be selected, if to them it shall seem advisable. Upon the successor being selected, the original trustee shall at once turn over to him all papers, moneys or other property coming to his hands as trustee. The signature hereto of the person being trustee under this agreement shall determine his acceptance of such trust and upon the terms herein set forth, and before executing the powers of the trust he shall furnish a bond, as shall be determined upon and accepted by a majority of the parties, to insure the proper performance of his duties as such trustee.

"*Second*—All proceedings in court respecting the said claims, demands, judgments, decrees, etc., shall be brought to a close with all practicable speed, and all suits on be-

half of said company, now pending against any of the parties hereto, shall be at once dismissed.

"*Third*—Judgments shall be at once rendered and entered upon all claims of the said Commercial National Bank against said company, if the court shall so determine; and the said judgments, as well as all judgments heretofore rendered in favor of said bank and against said company, shall also be duly assigned to the said trustee; and all judgments heretofore rendered in favor of said Hilton and against said company shall be immediately assigned to said trustee; and a decree shall also be entered against said company on the said claim of the said David A. Gage, and at once be duly assigned to the said trustee.

"*Fourth*—The said bonds, claims, parts of claims and decrees of said Harding and said Bennett shall be at once transferred and assigned to the said trustee.

"*Fifth*—A decree shall be entered by the said circuit court in favor of said Selah Reeve or the said assignee of said claim, and against said company, for the amount that shall appear to be due to him on the basis of said report of the said master upon the said accounting and the rulings and decisions of Judge Farwell, of said court, upon the exceptions filed on the part of the said company and the said Reeve, respectively, to the said report, except and provided that the ruling and decision of said judge in the matter of said report and exceptions, that the said Reeve ought to be charged in said accounting, as against his credits, with all the money paid by the stockholders of said company, shall be taken and considered error, and treated as such in figuring and arriving at the amount due said Reeve from said company and fixing the amount of said decree; and the amount of said decree in favor of said Reeve shall be established, determined and fixed upon the basis and rule of accounting in said accounting in this respect sustained, and reported by the said master in his said report, viz., that

said Reeve, in said accounting, should be and ought to be charged, as against his credits, with the money which he actually and personally received from said company, and no more, and without regard to the amount that may have been paid by the stockholders of the said company, unless good cause be shown to the contrary; that upon the entering of said decree it shall be at once duly assigned to the said trustee.

"*Sixth*—The parties hereto agree to contribute their influence and labors to the end that the property of the said company may be sold as soon as practicable, and that all·proper means be instituted for the early payment of the debts of the company.  It is also provided, that if it shall be deemed advisable by a majority of the parties hereto that the trustee should buy or attempt to buy, or make any offer for, the property of the said company, or any part thereof, then the said trustee shall act in that matter, and to the extent and in the manner and according to the advice and directions of the majority of the parties hereto, and whatever of the said property said trustee gets title to and possession of shall be held to the use of and subject to the direction of the parties hereto, or a majority thereof,—the will of the majority herein referred to, to be expressed only after due notice to all the parties hereto,—and shall be owned by them according to the percentages and proportions as hereinafter set forth, and also all outcome thereof.

"*Seventh*—None of the parties hereto shall, in any way or manner, for or without reward, assist or encourage any of the stockholders of the said company to contest, either in or out of court, the right of said company or its receiver to collect any assessment or assessments, or any sum or sums of money ordered to be paid and made, on account of any subscription heretofore made to the capital stock of said company, or assist, encourage, advise or interfere, in any way, in or about any litigation, legal proceeding or proceedings, which shall tend to prevent,

interfere with or embarrass the collection and payment of the above claims to and by the said trustee according to the tenor of this agreement, or which may tend to prevent the parties hereto from taking and retaining the proportions and amounts as herein provided, under penalty of forfeiture of all rights and privileges under this contract, and the repayment to said trustee of all moneys or other property paid or transferred by virtue of this agreement.

"*Eighth*—The said several claims, demands, judgments, bonds and decrees owned, and to be assigned and transferred, as aforesaid, shall, after said assignment and transfer, as a whole or aggregation, and the total amount thereof, and all money or other property received by virtue thereof, and all property purchased as aforesaid, be divided in the following proportions: Forty-five per cent (45 per cent) thereof shall be the property of and belong to said Sutherland by virtue of the said Reeve claims and the assignment thereof to him; eighteen per cent (18 per cent) thereof to the said Hilton; fifteen per cent (15 per cent) thereof to the said Harding; nine per cent (9 per cent) thereof to the said Commercial National Bank; eight per cent (8 per cent) thereof to the said Bennett, and five per cent (5 per cent) thereof to the said Gray. And the said trustee shall pay to the said parties, respectively, of the moneys or other property that comes into his hands and possession, by virtue of and by way of payments on and in liquidation of said claims, demands, judgments and decrees, bonds, etc., to be assigned and transferred as aforesaid, and in the above proportion, upon demand and receipt: *Provided, however*, that the amount of money paid to said trustee and received by him, and in liquidation of said claims, demands, judgments and decrees, etc., etc., and to be received by the parties as above set forth, shall not, except in the case of said Bennett and Harding, exceed the amounts of the claims of the said parties, respect-

ively, as legally adjudicated and determined, and including interest thereon; and all amounts that shall appear to be due the parties hereto, respectively, over and above the amounts of their respective claims, as aforesaid, including interest thereon, by virtue of the said percentages and proportions, shall belong to and be paid to the said Sutherland, Bennett and Harding, respectively, share and share alike,—that is, one-third thereof to each,—the same being as compensation to them for the extra services which they will have to perform in connection with the said claims and the litigation connected therewith, by reason of their previous close connection with the litigation in which said company has been and is involved, and their familiarity and knowledge concerning the same.

"It is also agreed to save and keep harmless from loss, by virtue of any assessment or assessments for payment of money or orders for the payment of money, made in pursuance of any decree of said court for the collection of money for the payment of the debts of said company, certain of the stockholders of the said corporation residing in the counties of Knox, Henderson, Warren, Mercer, Peoria and Henry, in the State of Illinois, as shall be designated by the said Bennett or the said Harding; and also Anthony W. Street of Iowa, C. H. Moore of Clinton, Iowa, A. Street of Nebraska, R. B. Frary of LaMoille, Illinois, Cairo D. Trimble of Ottawa or Princeton, Illinois, and J. M. W. Jones of Chicago, provided said Bennett or Harding so decide.   Nevertheless, provided that none of the parties hereto shall, in any way or manner, reap, obtain or receive any benefit, reward or advantage, either directly or indirectly, by virtue thereof, from any person or persons whomsoever:   *And provided, also,* that the parties hereto who may be stockholders of the said corporation shall be saved harmless from any loss by virtue of any liability as such stockholders:   *And provided, further,* that this agreement to indemnify stockholders from loss shall only be binding upon the parties hereto so far as

concerns the money that may come into the hands of the said trustee, as aforesaid, and this agreement shall not include or intend any further or other liability in this respect.    This contract shall extend to and be binding upon the heirs, executors, administrators and assigns of the parties hereto.    It is also provided that this contract shall not be considered executed, nor have any binding force, until signed and sealed by all of the parties hereto.

"In witness whereof, we have hereunto set our hands and seals this 18th day of June, A. D. 1879.

"The words 'unless good cause be shown to the contrary,' and also the words 'if the court shall so determine,' and the words 'a majority of,' and the word 'trustee,' on the sixth page hereof, and also the words 'and accepted by a majority,' on the seventh page hereof, were interlined before signing and sealing.

|  |  |
|---|---|
| THOMAS J. SUTHERLAND, | [Seal.] |
| Assignee of Reeve claim. | |
| JOHN CLARK HILTON, | [Seal.] |
| F. D. GRAY, | [Seal.] |
| JOHN I. BENNETT, | [Seal.] |
| COMMERCIAL NAT. BANK, | [Seal.] |
| By H. F. EAMES, *Pt.* | |

*August 18.*    GEORGE F. HARDING.    [Seal.]

"The interlineation of the words, 'the will of the majority, referred to, to be expressed only of the due notice to all the parties hereto,' and also the words, 'and also all outcome thereof,' were interlined after the signing of said bank, John I. Bennett and Thomas J. Sutherland, and we hereby give our consent to such interlineation.

|  |  |
|---|---|
| THOMAS J. SUTHERLAND, | [Seal.] |
| Assignee of Reeve claim. | |
| JOHN CLARK HILTON, | [Seal.] |
| F. D. GRAY, | [Seal.] |
| COMMERCIAL NAT. BANK, | [Seal.] |
| By H. F. EAMES, *Pt.* | |
| JOHN I. BENNETT, | [Seal.] |

*August 18.*    GEORGE F. HARDING.    [Seal.]

H. K. Whiton.

"The word 'or,' between the words 'Harding' and 'Bennett,' where it occurs, was placed in the above contract after the signing of the said Hilton, bank, Sutherland and Bennett, to which change we give our consent.

|  |  |
|---|---|
| THOMAS J. SUTHERLAND,<br>Assignee of Reeve claim. | [Seal.] |
| JOHN I. BENNETT, | [Seal.] |
| F. D. GRAY, | [Seal.] |
| COMMERCIAL NAT. BANK,<br>By H. F. EAMES, *Pres't.* | [Seal.] |
| JOHN CLARK HILTON, | [Seal.] |
| GEORGE F. HARDING. | [Seal.]" |

*August 18, 1879.*

This contract is not the original. Who was in possession of the original is not shown. Subpœnas *duces tecum* and the examination of witnesses failed to show where it was. Sutherland says he signed a paper between the creditors in August, 1879; that Gray and Whiton signed the paper which he had signed, some time afterward, and is unable to say whether the paper produced is a correct copy of the one he signed or not. Eames says he is inclined to believe he signed the contract on its date. Gray has no remembrance of the paper, but says if he did sign it, it was some time in 1880. Harding has no recollection of signing the paper of June 18, 1879, and does not think he ever signed a paper of which the exhibit is a copy. He says: "I was an opponent of the Reeve claim, and continued to be until it had been finally adjudicated in his favor in some way, and I came at the last moment into the fold, whatever it was, as to some combination to preserve the rights of the creditors as against the Western Union, which was threatening to eat us all up." He is sure he executed no agreement prior to 1880, and whatever agreement he and Bennett executed was with reference and a view to releasing stockholders, to whom they felt some relation. It is clear, from his own testimony, he executed a paper of this character, and his positiveness is with reference to the date. John I. Bennett and

Frank I. Bennett saw the original, made and compared
the copies and knew the handwriting of the signers, and
their testimony is clear and convincing as to the exist-
ence of an agreement and the correctness of the copy
produced in evidence.

This contract being entered into by the parties thereto,
on August 7, 1879, an interlocutory decree was entered in
the cause by Judge Barnum, ordering that the accounting
then being carried on in behalf of Selah Reeve should
thereafter be carried on in the name of Thomas J. Suth-
erland.   On August 27, 1879, Sutherland, as solicitor for
Reeve, gave notice to Harding, McCoy & Pratt, as solic-
itors for the corporation, that he would, on August 28,
1879, at ten o'clock A. M., move before Wait for the mak-
ing by said master of his report in the accounting with
the corporation.   That notice is indorsed, "Service ac-
cepted August 27, 1879.—Geo. F. Harding."   The master
gave notice to Harding, McCoy & Pratt, as solicitors for
the corporation, and to Thomas J. Sutherland, as solic-
itor for Reeve, on September 11, 1879, that he had pre-
pared his report, and the same could be examined at
ten o'clock A. M., September 12, 1879.   That notice is
indorsed by acceptance of service by Sutherland, and
"Received copy of above notice September 11, 1879.—Geo.
F. Harding."   On September 13, 1879, the master, Wait,
filed his report.   By that report he states that "Thomas
J. Sutherland appeared as solicitor for Reeve and offered
in evidence the testimony taken in the cause, the excep-
tions thereto of Reeve, the Great Western Telegraph
Company and Kidder, and other papers in the case; that
no further evidence was offered and no further proof
adduced showing any other receipts of stock, money or
other property, except as herein set forth."   He then
finds that the work done and money received from the
company up to June 30, 1870, is not *res judicata*, and then
finds that Reeve constructed the lines prior to November
16, 1872, as found by Chase, and fixes that amount at

$225,762.43. He also finds that Reeve did not build the 417½ miles of completed and the 267 miles of uncompleted lines, or receive the sum of $151,550.90 referred to in the report of Chase, and then makes the schedule of the account, making the total of Reeve's credits $252,654.22 and debts $141,801.49, and finds the balance due Reeve, with interest, on September 13, 1879, to be $154,861.25.

On September 15, 1879, Sutherland gave notice to the solicitors of complainants and some of the defendants to the cross-bill, and also to Harding, McCoy & Pratt, as solicitors of the corporation, that a rule had been entered to answer the cross-bill of Reeve by September 19, 1879, and on September 20, 1879, a decree of confirmation of the report was made, and the decree was entered defaulting the corporation as defendant to the cross-bill. From the time of filing that cross-bill, for years, it lay quiet and undisturbed until the agreement of June 18 was effected, which seems to have revivified it.

In analyzing Wait's report it is necessary to consider on what it was based. It is apparent from what is said in the opinion in the *Terwilliger case* that the corporation had no money. The evidence in this record discloses that fact. Its stock had all been taken, and, with the exception of three shares, was held by Gage, Selah Reeve, Hasbrouck Reeve and Snow. Neither Gage, Snow nor Hasbrouck Reeve paid anything into the corporation to build the lines. There was no money to build them. The corporation had no means of procuring money except by a call on stockholders, and no call had been made on Gage, Snow or the Reeves. Such was the status of the corporation before the institution of the Terwilliger suit. Gage was its president, and he had contracted with Selah Reeve to build for the corporation 2000 miles of line, and by the same contract transferred to Snow, as his trustee, the 117,897 shares of stock, to sell and dispose of the same in such manner and at such times as should, in his discretion, seem best to provide the necessary means for

the prosecution and completion of said contract, and to apply the proceeds thereof, as fast as they might be needed, for the performance of said contract in accordance with the terms thereof. By a supplemental contract further covenants were made, and Reeve, Snow, as trustee, and Gage, as president of the corporation, were parties signing it. Gage, Snow and Reeve acted on the contracts as binding and valid. No other contract appears to have been made by the company for the construction of its lines. Gage, Reeve and Snow acted on the subscriptions as valid and binding. As they stood to each other and to the corporation at that time, no new subscribers or purchasers of stock being interested, the contract and subscription were valid as between those parties. Then Reeve's stock was being sold under this arrangement among the parties, and the money derived from the sale of that stock would necessarily come to the hands of parties authorized to receive it by Reeve or his authorized trustee, agents or employees. He never claimed to the contrary before the decision of this court in the *Terwilliger* case. No other conclusion can be warranted by the facts than that the work on the 417½ miles of completed lines and the 267 miles of uncompleted lines was done under his contract, and the $151,550.90 was received by him, his trustee or agents. He afterward gave his receipt therefor, and not until the wreck of the plans of these men who had evolved this scheme, resulting from the opinion in the *Terwilliger* case, did they form or attempt to set up a different theory. It was so recognized from the evidence in the opinion in the *Terwilliger* case, so believed by the judge making the order of reference to Chase in 1873, and so known by Judge Farwell when he sustained the exceptions to Chase's report and ordered a reference to Wait.

Reeve says in his cross-bill (and Wait so finds) that he did not build the 417½ miles of completed nor the 267 miles of uncompleted lines, nor receive the money paid

therefor, but claims it was represented to him by the corporation that the lines had been built by it and the money expended,—the money as his,—and that he ought to give said company his receipts for said moneys "as if he had really built said lines and had really received said amount of money in payment thereof in pursuance of said contract; and your orator says that the argument of said company then appeared plausible and reasonable to your orator, and at the request of the said company, as aforesaid, he did give to the said company, at various times, his receipts for the said money the same as if he had received it, and allowed it to be considered that he, your orator, built the said lines and parts of lines for which said money was expended, when, in fact, your orator did not build said lines and did not receive any of said money; and your orator says that it was testified to by himself and the said company, and the officers thereof, in this cause, before it went to the Supreme Court aforesaid, and upon which evidence the said Supreme Court partly relied in giving its said opinion, and which opinion was the rule followed by this honorable court in its decision and decrees subsequently entered in said cause that your orator built said lines and parts of lines and received from the company the said sum of money, when, as a fact, the contrary was and is true, although at the time said evidence was given it seemed to your orator to be true, as said contract was then undisturbed and not set aside, and in full force; and your orator states that the statements made in his answer in this cause were based upon the same facts and understandings and theories as those which governed the giving of said evidence and testimony."

One does not have to read all this bewildering record to see that Reeve was not an unsophisticated man incapable of caring for himself, nor to find that Sutherland, his attorney, throughout all this litigation was able to comprehend facts, and the statement in the cross-bill of

facts different from a former sworn answer, and from his own testimony confessedly made, indicates not so much ignorance as moral obliquity. With the averments of the cross-bill and with the first order of reference, with Chase's report and with Judge Farwell's ruling in sustaining the exceptions, Wait's report is incomprehensible, except that Wait was misled by suppression of the facts. In his report he states what evidence was heard, and disregards the orders of reference in taking testimony to show what money was received by Reeve, his trustee, agents and employees. And it is apparent that, relying on the knowledge and skill of Harding and Sutherland, on opposing sides, he allowed himself to be misled and was induced to act by Sutherland alone, and with the contract of June 18 concealed from him, with Harding and Sutherland acting in concert and with others to attain a common end, in which the interests of the corporation were to be sacrificed,—these facts, it must be held, constitute fraud in securing that report. He was deceived as to the corporation being represented by counsel and was deceived by suppression of facts. *Suppressio veri, suggestio falsi.*

When the contract of June 18 was discovered and this bill filed, it was sought to be shown that notice was given to other representatives of the company than Harding. Sutherland claims he served notice upon Pratt as well as upon Harding. The master acted on the notice to Harding as sufficient, and from the entire record we are of the opinion that Harding alone had notice.

The decree of confirmation of Wait's report being entered, and the bill which challenged the character of the claims of the bank, Reeve, Hilton, Gage and others having been dismissed and these claims all allowed, the scheme of making a call upon the stockholders, who by the thousands were citizens of Illinois, Iowa, Wisconsin, Nebraska and elsewhere, was determined on. During this latter litigation, H. K. Whiton, who was connected

with the June 18 contract, was of counsel for the bank. Sutherland, as attorney for the receiver, procured an order on October 16, 1879, directing that receiver to collect from stockholders the unpaid balance of the first forty per cent on their stock, and at about the same time the sale of the lines of the corporation suggested itself to these parties. These lines had been in possession of the Western Union Telegraph Company under its lease from Horton, the first receiver, and the latter company had abandoned its lease and the lines had become greatly out of repair. A new corporation, entirely disconnected from any of these, had been organized—the American Union Telegraph Company—and was about to begin business in this territory, and desired to acquire the lines and franchises of the Great Western. It was this fact, as Bennett says, that induced these parties to join in their combination. In carrying out their design they first had the receiver, Thomas S. McClelland, lease the lines for five years, at $2000 per year, to George L. Otis, who, it will be remembered, was cashier of the Commercial National Bank, and had been the treasurer of the Great Western when Reeve's coterie of officers was in power. Under this lease the receiver was to put the lines in working order and deliver them to the lessee as fast as possible. Sutherland, as the receiver's attorney, procured the necessary orders of court for the execution of this lease, which Otis transferred to H. K. Whiton, who was the trustee under the conspiracy contract. The parties thus had the situation under such control that no one else could buy the lines except subject to their five year lease. They then negotiated with the American Union, had Whiton lease the lines to it, and on November 10, 1879, entered into a written contract with it. By this contract it was agreed, in substance, that they should endeavor to procure, in their own names or that of their trustee, the title to the lines, and when this was done the American Union should buy the property of them at

its market value, to be fixed by arbitration, and that in determining the value the arbitrators should assume, absolutely, that the lines were in good working order, and should not consider any evidence to the contrary, or consider what the property cost the sellers. It also provided that upon the delivery of the lines to the American Union under the above lease it would advance to the receiver enough money to secure the possession and put the lines in good working condition, and assign its claim against the receiver for these advances to the sellers.

As soon as this contract was made, on November 15 the receiver made a contract with the American Union, by which it was to put the lines in good working order. The parties then proceeded to get the property into the hands of the American Union, and to have the necessary order for a sale entered. The dispute with the Western Union was settled, and on January 20, 1880, the property was placed in the hands of the American Union. They then, on February 4, 1880, filed a petition, verified by Sutherland, stating that they represented a majority of the creditors; that the repairs on the lines would soon be completed, and the time "seemed auspicious" for a sale of all the telegraph lines and other assets of the company, subject only to existing leases; that the best price would be obtained if the whole property were sold as a unit, for cash, but if any creditor purchased he should be allowed to apply on his bid, as cash, any adjudicated claim against the company. An order for a sale by the master on those terms was prayed. On the same day that this petition was filed an order was entered directing a sale by H. L. Wait, master, of all the company's property, franchises, etc., at public auction, on the conditions stated in the petition. Under this order Wait sold the property on March 18, 1880, to Whiton, as trustee for these parties, for $15,000. Thus these parties— prominent among them the attorneys for the company and the receiver—having so forestalled the market that

competition at the sale was practically impossible, bought the property at $15,000, and paid almost all of the price by crediting on their claims the insignificant dividend which that sum would pay. They then, by a re-sale contracted for in advance, pocketed over $38,000 of the money justly belonging to the company and its stockholders. By this means the stockholders, who were now to be pursued by these parties, were deprived even of the benefit of having the claims reduced by the·full amount which could be realized from a fair sale of the corporation's property.

On August 16, 1880, John I. Bennett sold his claim against the company to John J. McClellan, reserving his interest in the contract of June 18, 1879, and reserving his interest in the property purchased by Whiton. The claim of the bank was also, about the time of the sale to the American Union, assigned to the defendant Adelaide K. Sutherland, the wife of Thomas J. Sutherland, who, although then the receiver's solicitor, acted as her agent in effecting the purchase. Shortly after the sale to the American Union Thomas S. McClelland resigned as receiver, and, on motion of Sutherland and Harding, Elias R. Bowen, a clerk in Harding's office, was appointed in his place. Bowen was in office when this suit was begun. He died in March, 1892, while the case was on hearing, and Frank A. Helmer, his successor, was substituted as defendant.

As stated, an order of assessment against stockholders was procured on October 16, 1879. This order directed all stockholders to pay the unpaid balance of the first forty per cent of their stock, and authorized the receiver to enforce collection, by suit or otherwise. Under this order the receiver employed attorneys to collect from the stockholders in different States, Sutherland, at the request of the larger creditors, having personal charge of the collections in Illinois and Wisconsin. This placed the enforcing of the assessment, so far as Illinois stock-

holders were concerned, in the hands of the parties to the conspiracy contract, and placed them in a position to render effectual its provisions for the protection of their particular friends.

On February 24, 1880, Sutherland represented to the court that nine-tenths of the creditors desired an order entered by which stockholders would be allowed to pay this assessment by setting off an equivalent amount of adjudicated claims against the company. A petition for this purpose had been filed on December 8, 1879, and the order was entered, as asked by Sutherland, on February 24, 1880. This enabled the holders of claims against the company to sell releases of them to stockholders, to be used in paying the assessment, and from the receiver's report and otherwise it appears that a considerable number of claims held by Sutherland were paid in this manner. The two receivers, Thomas S. McClelland and Bowen, under this order, received releases of claims against the corporation amounting to $22,318.15.

Various proceedings were instituted to collect from stockholders, some by the receiver under the order of October 16, 1879, some by creditors individually. A bill was filed by Counselman, John J. McClellan, and Bowen, the receiver, in Iowa, against stockholders there, as the result of which $4143.50 was collected. Sutherland filed a petition in the *Terwilliger case,* asking for an allowance for services rendered. He was at this time the receiver's attorney. There was no opposition to this petition, and he secured an allowance before the master of $10,596. In drawing the order confirming this report, Sutherland not only had it allowed as a claim against the receiver, but entered as a personal decree against the company also, with an award of execution. Upon this decree and some other claims he filed a bill in his wife's name, against the company, the receiver and a number of stockholders, seeking to enforce their stock liability for his benefit.

It was finally determined that the most effectual method of collecting these claims against stockholders was through a general assessment by the court. Under the present statute of 1872 such an assessment can only be made in a proceeding to which all the stockholders are parties. In order to escape this—for it was no part of the plan of these men to allow any one to be heard— the assessment proceedings were instituted as a sort of supplement to the case in which the receiver had been appointed. Then, by making it appear that the decree was in a case begun prior to the enactment of the statute of 1872, it could be claimed that the prior law governed, under which stockholders were not required to be made parties. Accordingly, on April 10, 1886, Sutherland filed a petition in the name of Bowen, as receiver, setting up that the company's debts amounted to between $350,000 and $400,000, that its property was exhausted, and that an assessment against stockholders was neces- ·sary. This petition was referred to Wait, and the necessary proof before him was supplied wholly by the oral testimony of Sutherland, Bowen, Hilton and George F. Westover, the latter testifying merely as an expert. By the testimony of Sutherland and Bowen it was made to appear, and the master found, that the indebtedness of the company amounted to at least $375,000, and that it was necessary to assess the stockholders on that basis, and that one-third should be added to this to cover the cost of collection. Upon this basis an assessment of thirty-five per cent, or $8.75 per share, was found necessary and recommended. This report was confirmed, and on July 10, 1886, a decree was entered assessing the stockholders in accordance with its recommendations. No notice of these proceedings was given to the corporation or its stockholders. The whole thing was carried through on the theory that the corporation, being a party to the suit, represented the stockholders, that the receiver represented the corporation, and that therefore all these

adverse interests were affected and concluded by the representation of Sutherland, as the receiver's attorney, acting in his own interest and that of other parties to the contract of June 18.

As we have stated, under the order allowing set-offs of claims against stock subscriptions, claims against the company were satisfied to the extent of $22,318.15. Of this amount claims amounting to $12,109.84 were released to Thomas S. McClelland, receiver, between March and December, 1880, and $10,208.31 to Bowen. Of the amount thus released to Thomas S. McClelland, $5260.90 had been released when Wait made his report of June 25, 1880, under the reference directing him to ascertain, among other things, the amount of the company's debts. The remainder of all the debts found by Wait in that report to be owing by the corporation amounted to $271,249.62. The gross indebtedness found by Wait in that report was thus reduced by $17,057.25. If the claims of Reeve, Hilton and the rest of these parties be conceded to be valid, the amount of the company's debts at the time of the assessment in July, 1886, stood as follows:

Total of claims as per Wait's report.....................$271,249.62
Less net proceeds of the sale of the lines ($15,000, less $280
    master's fees)........................................ 14,720.00

                                              $256,529.62
Less claims subsequently paid by set-off................. 17,057.25

                                              $239,472.37
Interest from date of Wait's report to decree of assess-
    ment (substantially six years, at six per cent)....... 86,210.05

                                                $325,682.42

Bowen testified that the debts were from $350,000 to $400,000, and Sutherland that, as he figured it, "they amounted to over $375,000," and on this evidence Wait found that the debts were "a little over" $375,000, and the assessment was made on that basis. To this statement of the amount of the indebtedness the master was induced, by the evidence placed before him by Suther-

land and Bowen, to add thirty-five per cent—$131,250—as the estimated cost of making the collections, in the way of counsel fees, receiver's fees, etc.    The estimate of the expenses of collection they immediately proceeded to verify by placing the matter in Sutherland's hands, and agreeing to pay him twenty-five per cent of all collections.

It will thus be seen that, leaving entirely out of view the fraudulent contract into which Sutherland had entered and his other acts under it, a court of equity, which proceeded solely upon the information furnished by Sutherland and Bowen, was induced to enter a decree which authorized the collection from the stockholders of this company of $180,000 more than the corporation owed upon any theory, and by which Sutherland would be enabled to collect in full his claim of $153,270.23 and his wife's of $17,983.98, with interest, and to get for this service in his own behalf twenty-five per cent of the amounts collected from stockholders.    If the decree of assessment were carried out on the basis on which it was rendered, there would be collected from stockholders $506,250, and of this amount there would be paid to Sutherland, upon his own and his wife's claim, and for services in collecting, $297,816.21,—and this in addition to the decree of $10,596 for fees, entered in September, 1883.

It will be remembered that Franklin D. Gray was a party to the contract of June 18, 1879.  ·Under its provisions, and as owner of the Gage claim, he was interested in having the assessment upheld and collected.  He was a stockholder in the company, but by the provisions of this contract was to be saved harmless from any liability on that account.    He was therefore interested in securing his own defeat in any suit brought against him on the assessment, and his prominent position would add to a decision, in a suit apparently defended by him, great weight with other stockholders who did not understand his real position in the matter.    Sutherland was Gray's

attorney in procuring the Gage claim for him, in advising him with reference to the June 18 contract, and in other matters. A suit—called by Gray in his testimony "a friendly suit to test the assessment"—was brought against him by Sutherland,—not in Cook county, where he lived, but in Lake county. The case was there decided against the plaintiff on demurrer to the declaration. An appeal was prosecuted to the Appellate Court, where the judgment was affirmed, and from there to the Supreme Court, where it was reversed. The Supreme Court held the decree of assessment binding on stockholders though they were not parties, because the declaration alleged that it was rendered in a suit begun prior to the enactment of the law of 1872. (*Great Western Telegraph Co.* v. *Gray*, 122 Ill. 630.) There was no sort of representation of the stockholders' side of the question, and no real controversy between the parties to the case.

Of this case the following facts may be noted as to Gray's interest : Gray was introduced to Winters, the attorney who was to represent him in the case, in Sutherland's office. He swore in this case that he retained the attorney and paid him for his services, the money being paid either to Winters or to Sutherland. Winters swore that Gray never paid him anything and that he never expected anything from Gray—that his fees were to be paid by Sutherland. On cross-examination, Sutherland, after refusing to answer the question and being ordered to do so by the master, was compelled to admit that he himself paid for the printing of the briefs filed on Gray's behalf, stating, however, that Gray refunded the money to him. The opinion in the *Gray case* was filed in November, 1887, but no subsequent steps were taken. The case was never re-docketed in the lower court, and Gray was not called upon to pay the assessment for which he was thus held liable. A year later the bill in this case was filed alleging these facts. The receiver answered, through Sutherland, his attorney, that he expected to

collect from Gray at an early date, but the answer which Sutherland filed for Gray made no allegation that he expected to pay the assessment. A year and a half after this statement was made Gray still was left undisturbed, though other stockholders were compelled to pay, and he has never been called on to pay the assessment, but still enjoys the immunity guaranteed him by the contract of June 18.

The secret combination between these parties and their acts in carrying it out were not discovered until within a month before this bill was filed. The orders and decrees allowing claims, etc., were matters of public record, but the underlying circumstances were unknown, and were of such a nature as to conceal themselves. The undisputed evidence shows that neither the complainants, nor Stark, the president of the corporation after 1874, knew of the facts upon which the charges of fraud are based until September, 1888. No attempt was made by the defendants to show knowledge on the part of the complainants or the company of the June 18 contract. The whole theory of the defense was confined to a denial.

At the time this bill was filed the Great Western Telegraph Company was a corporation only in name. It had been in the hands of a receiver for about fourteen years, and during all that period the terms of officers and directors had expired without re-election. If the old officers held over because no new ones were elected, still they had no voice in its management or control over its affairs. The exclusive control of its property, affairs and corporate rights was in the hands of the receiver. More than eight years before this bill was filed all the corporation's assets, franchises and property rights were sold by the court. Bowen, the receiver, who had charge of the affairs of the corporation at the time this bill was filed, had then been in office about eight years, and during that time

Sutherland had been his legal adviser. His original appointment was procured on motion of Sutherland and Harding. He was a clerk in Harding's office, and he and Sutherland, as we have stated, procured the decree of assessment. When this bill was filed, making these serious charges against Sutherland of frauds committed upon the corporation, the stockholders, the court and the receiver, Bowen placed the defense of the suit exclusively in the hands of the man charged with the fraud. Not only did he place the receiver's official defense in Sutherland's hands, but he authorized him to appear for the company as well. He and Sutherland together prepared an answer, in which the corporation was made to speak in defense of those claiming to be its creditors, but against its stockholders; to deny that any fraud was committed against it; to assert the validity of the Reeve claim, the absence of any defense to it, and the fairness and justice of Wait's report upon it; to assert the justness of the claims of Hilton, the bank and the others that it had fought previously, when its bill was dismissed for want of a bond for costs; to deny the complainant's right to inquire into the disposition of the property sold by Whiton, or the profits of that transaction; to set up a defense for the protection of those who conspired against it, and to plead the Statute of Limitations against the stockholders' right to relief for alleged frauds committed upon it and them by the attorney who filed the plea. Throughout the cause Bowen sought, under the advice of Sutherland, to prevent the complainants from unearthing a fraud, in the investigation of which he should have been an earnest worker.

It appears that Sutherland had purchased certain claims against the corporation, and among others that of Collins & Burgie, and at the time of that purchase he contracted with them to save them blameless from liability as stockholders by the following contract:

"CHICAGO, *April 14, 1880.*

"I, Thomas J. Sutherland, do hereby agree to save Collins & Burgie harmless from any further payment by virtue of their subscription to the stock of the Great Western Telegraph Company so far as my interest in claims against said company is concerned.             THOMAS J. SUTHERLAND."

These are the facts shown by this record, stated as briefly as it has been possible to do, and these facts are substantially and sufficiently averred by the bill filed in this cause. The relief sought is: First, to have the decree allowing the Reeve claim reviewed and set aside for error, and for fraud, both actual and constructive, in procuring its entry; second, to have the allowance of the claims of John Clark Hilton, the Commercial National Bank, (now held by Mrs. Sutherland,) reviewed and set aside for the same reasons; third, to secure a perpetual injunction restraining the collection from stockholders of all these claims, as well as those of Bennett, now owned by John J. McClellan and George F. Harding, upon the ground of fraud; fourth, to have the decree of assessment of July 10, 1886, reviewed and set aside for error in entering it and for fraud in procuring it; fifth, to have the court withhold its further aid to the collection of the claims of these conspirators; sixth, to have it declared that the complainants and other stockholders are discharged from liability to contribute to the payment of the claims of the conspirators by reason of their release of some of the stockholders in the conspiracy contract and Sutherland's release of Collins & Burgie; seventh, to have the sale of the telegraph lines declared fraudulent, and the defendants held accountable for the money realized from the property, and to have the money applied to the actual debts of the corporation; eighth, to have the Reeve claim, if held to be to any extent valid and enforceable, set off against Reeve's liability as a stockholder, because his insolvency prevents the enforcement against him of the right of contribution;

ninth, to have the claim of the bank in Mrs. Suther-
land's hands, if held to be otherwise valid and enforce-
able, expunged, except for such sums as she may have
paid for it in good faith; tenth, to have an accounting of
claims held by Sutherland and Harding, the amount paid
for claims, and the amount collected; eleventh, to have
the decree allowing fees in Sutherland's favor set aside
and its collection enjoined upon the ground of fraud.

On June 6, 1890, Sutherland withdrew his appearance
as solicitor for the receiver, as also for the corporation
in the litigation under this bill. Several parties to the
bill had died, and leave to amend and to file supple-
mental bills had been entered. To this bill John J. Mc-
Clellan and Terwilliger were defaulted. Demurrers were
filed by Harding, Sutherland, Gray, the Great Western
Telegraph Company and Bowen, and by Mrs. Suther-
land, as also by Hilton. These demurrrers were over-
ruled and answers were filed by Bowen, receiver,
Adelaide K. Sutherland, the Great Western Telegraph
Company and Gray, by Sutherland, and Harding and
Reeve. Gage was also defaulted. Hilton elected to
stand by the demurrer and subsequently died, when a
supplemental bill was filed and Licinia E. Hilton was
made a party defendant, to whom his claims had been
devised, and she filed a general demurrer, and it being
overruled she elected to stand by the demurrer. Subse-
quently Bowen, the receiver, died, and Frank A. Helmer
was appointed his successor, and was substituted as a
party defendant. May 27, 1889, A. J. Hoagland asked
leave to intervene and become a party complainant,
which was allowed. On August 2, 1889, one Milliken, on
leave, also became a party complainant.

The several answers were general and specific denials
of the averments of this bill, etc. The cause was referred
to Boyesen, as master in chancery, to take proof and
report his conclusions to the court. That report covers
sixty-six type-written pages, and will be but briefly ab-

stracted. It sets out the proceedings in the Terwilliger
suit, and the reports, exceptions, decrees, etc., the peti-
tion for sale of the lines, and decrees finding the debts
of the corporation amounted to about $375,000, and that
the expense of collecting would amount to about one-
third more; finds the contract of June 18 was executed,
and the copy was admissible in evidence; found Reeve in-
debted to the company in the sum of about $140,000. This
conclusion was reached by the master by his holding
that the decree entered by Judge Farwell sustained every
item of charge that had been made by Chase against
Reeve, and, by sustaining the seventh exception made
by the corporation, Reeve was chargeable with $200,000
in addition to the amount with which he had been charged
by Chase in his report. The master further held that the
contract of June 18, 1879, was fraudulent *per se*, and that
the report of Wait made September 15, 1879, and the de-
cree made September 20, 1879, were obtained by fraudu-
lent concealment from the receiver of the decision of the
circuit court on the claim, and by the fraudulent combi-
nation of the parties to the contract in obtaining the
report and decree without proper notice to the receiver
and company, and that the master was deceived by its
being made to appear that the receiver and the corpora-
tion had been duly notified, and that the court in the
same manner had been misled when no notice had been
given except to a party to the fraudulent contract, and
found that the report and decree were the result and in
furtherance of the objects of the contract of June 18,
1879, and·were injurious to the interests of the corpora-
tion and the stockholders, and fraudulent and inequi-
table. The master further found that at the sale made by
Wait of the lines of the corporation they were purchased
by H. K. Whiton, as trustee, under the June contract, for
the price of $15,000, and that the sale was confirmed and
a deed made, and that prior to the purchase by Whiton
the parties to the June contract had entered into a con-

tract with the American Union Telegraph Company, by which they were to sell the lines to that corporation when they obtained title thereto, at a price to be fixed by arbitration, and that subsequently arbitration was waived and the property purchased by the American Union from Whiton for $40,000, and of the proceeds of this sale Sutherland received $17,681.31, Hilton $5895.72, Bennett $2619.46, Gray $1637.15, Harding $7622.44, and the Commercial National Bank $2762.60, the balance being expended for receiver's and trustee's fees, etc.; that Harding, Gray and Sutherland should be decreed to account to the receiver for the full amount received from the American Union, less the expense of sale; that they had paid no actual money for the lines, and these parties to the June contract paid for the lines by crediting the amount of their bid, $15,000, on the claims held by them, respectively. The master found that the claims of the Commercial National Bank and Hilton had been reduced to judgments at law, and allowed by the master; that the claims of Bennett, Harding, and McCoy & Pratt had been allowed, and Harding was the holder of bonds; that the claims of the bank, Hilton, and Gray as the assignee of Gage, were, at the time of the June contract, involved in litigation by reason of the bill filed by the corporation, but that bill had been long pending, and the causes alleged in the bill for their being fraudulent were by reason of matters which could have been set up as a defense at law, and recommended that the claims of Gray, the bank and Hilton should be allowed to stand as proved, with leave to the corporation or receiver to introduce any evidence which could have been introduced, under the bill attacking said claims, to show whether they should be expunged, and that a reference should be made for that purpose; that the claims of Harding and Bennett should not be expunged, but an account should be taken as to how much money had been received from the sale of the lines and how much Harding had received

from the collections from stockholders.   He further recommended a reference to ascertain what claims Sutherland had purchased which are actually owned by him, and the amount he paid for them, and on the payment of that amount, with interest, the claim be declared satisfied; that the effect of the contract of June 18 was not to release any of the stockholders, nor was the covenant between Sutherland and Collins & Burgie one that stockholders could have pleaded in bar of their liability.   The master further found that the amount of claims against the corporation which had been allowed and confirmed, excluding those of the parties to the June 18 contract, amounted to the sum of about $21,000, and that the decree of assessment under which the receiver was then acting was in excess of the amount due, and a reference should be made to ascertain the actual amount now due. The master further found the claim of the bank, now owned by Adelaide K. Sutherland, was purchased through her husband, Thomas J. Sutherland, when he was the attorney for the receiver of the company, and recommended that she should be paid on that claim no more than she actually paid for it, with interest, and further found that the decree against the corporation of September 26, 1883, for Sutherland's services as solicitor, was erroneous on its face, because legal services to the receiver were not a liability of the corporation, and recommended that so far as executed it should not be interfered with.   The master held that *laches* was not to be imputed to the complainants in filing the bill, as no officer of the corporation had notice of the June 18 contract, or of any similar combination or arrangement, until shortly before filing this bill, nor had complainants such notice; found no fraud against Bowen or cognizance of any fraud charged against Sutherland, and recommended a decree setting aside the decree of assessment and the decree confirming Wait's report on the Reeve claim; that the claims of Reeve and of Sutherland, as his assignee, be expunged.

as invalid claims; that they be relegated to their remedies at law, or left as they had placed themselves by their June 18 contract; that Harding should account and be directed to pay over anything in excess of the amount of his claim as it stood prior to the contract of June 18, and as to so much as remains unpaid as it stood prior to that contract he be permitted to share in collections made by the receivers, and that a personal decree be entered against Sutherland, Harding and Gray for the amount received from the sale of the company's lines.

Sixteen exceptions were filed to the report of the master by the complainants, seven by Bowen, the receiver, and one hundred and ten each by Selah Reeve, Thomas J. Sutherland, Adelaide K. Sutherland, Franklin D. Gray and George F. Harding, which were overruled by the master, and the same exceptions were filed on the hearing.

On May 16, 1891, George F. Harding, Thomas J. Sutherland, Franklin D. Gray and Adelaide K. Sutherland, four of the defendants, filed their petition for a further reference of the cause, for the purpose of a further examination of John I. Bennett, and made an exhibit to that petition the answer filed by John I. Bennett to a bill filed by William N. Gregg against the Great Western Telegraph Company and others.

On the 11th day of July, 1892, George F. Harding entered his motion for leave to file an amendment and supplement to his answer to the original amended and supplemental bill in this cause, by setting up that on September 4, 1888, Eugene C. Bates and thirty-three other stockholders of this corporation, in behalf of themselves and all others who might come in as complainants, filed their bill, setting up substantially the same matter as alleged in this bill, including the contract of June 18, 1879, and asking the same relief, and averring that that bill was dismissed by the circuit court for want of equity, which was affirmed by the Appellate Court,

and afterward, on October 31, 1890, affirmed by this court, and further alleging what was held in that case, and alleging *res judicata*,—which opinion is *Bates* v. *Great Western Telegraph Co.* 134 Ill. 536,—and further seeking to set up in defense *laches* and the Statute of Limitations of five years.

On the 11th of July, 1892, the motion of the defendant Harding for leave to file an amendment to his answer was denied, except as to the defense of *laches*, which was allowed, and the petition of the Sutherlands, Gray and Harding for a reference of the cause was denied, and the cause being heard under the evidence, report of master and the exceptions thereto, a decree was entered dismissing the original and supplemental bills in the cause, and the complainants jointly and severally prayed an appeal to the Appellate Court for the First District, where that decree was affirmed, and from the judgment of that court an appeal is prosecuted to this court.

The contract of June 18, 1879, provided that the ruling and decisions of the judge on the exceptions, and the report of Chase in reference to the Reeve claim, by which he was to be charged, in the accounting, with all money paid by the stockholders of the company, as against his creditors, should be taken and considered error, and treated as such in determining the amount due Reeve from the company, and that in stating the account Reeve should be charged, as against his credit, only with the money he personally received from the company, and no more. It also provided for the allowance of the claim of the Commercial National Bank, and the assignment of the several claims in that contract mentioned, to a trustee, to hold and collect all money towards the payment of the same, with interest, and to buy the property of the corporation, if deemed advisable, and hold the same for their benefit and use; that the parties thereto should not, in any way or manner, contest the right of the company or its receiver to collect any assessment or assess-

ments; that, except as to Bennett, Harding and Sutherland, the amount paid should not exceed the amount of the claims of the parties, with interest, as legally determined, and that all amounts collected over and above such claims, with interest, were to be paid "to the said Sutherland, Bennett and Harding, respectively, share and share alike,—that is, one-third thereof to each,—the same being as compensation to them for the extra services which they will have to perform in connection with the said claims and the litigation connected therewith, by reason of their previous close connection with the litigation in which said company has been and is involved, and their familiarity and knowledge concerning the same." It further provided that they would save and keep harmless certain stockholders, designated by name or residence, from any liability by reason of any assessment made against them, and all money received or property purchased was to be apportioned among the parties in accordance with the percentage to be paid each, as fixed by the contract itself. It provided for the dismissal of any suits brought by the company there pending.

At the time of the execution of that contract the bill of the Great Western Telegraph Company against Reeve, Gage, Snow, Hilton, Commercial National Bank, Otis, and others, was pending, and that bill was filed by Joshua Stark, and Harding, McCoy & Pratt, as solicitors. This bill was dismissed on October 7, 1879, for failure to file security for costs, in accordance with the order of September 20, 1879, notice of which order was, so far as the record is concerned, received by Harding alone. The purpose of that bill was to set aside certain claims, as being fraudulent in their inception, and which were alleged to have originated in the fraudulent construction contract between Reeve and the corporation, and it was averred therein that Hilton, Gage and the bank had notice of the consideration of the claims. Sutherland, as

the solicitor for Reeve, and Harding, as the representative of the corporation, having notice of the motion for a rule to file bond for costs, had, by their contract, entered into without the corporation being a party thereto, stipulated for the dismissal of this suit, as it was included within the terms of that contract, and these claims thus sought to be contested by this corporation, and with which Harding was intrusted, as counsel, constitute the greater part of, and almost all, the claims mentioned in the contract, the allowance and payment of which were clearly the object, scope and purpose of that agreement.

Counsel for Selah Reeve insists that notice was given to Stark by Harding, and of the numerous letters in evidence which passed between Stark and McCoy & Pratt he refers to and relies on the following, as showing that McCoy & Pratt and Stark were also of counsel contesting the Reeve claim, and says:

"It must be admitted that Sutherland served notice on Harding that he would ask Wait to make his report,—that the notice of the master that he had prepared his report and that he would file the same, and Sutherland's notice that he would apply for a decree, all were served upon Harding. The record shows, beyond any question, that these notices were at once sent to Stark, at Milwaukee. Upon the reception of these papers Stark at once wrote to McCoy & Pratt, as follows:

" 'MILWAUKEE, WIS., *Aug. 29, 1879.*
" '*Messrs. McCoy & Pratt, 151 Monroe street, Chicago, Ill.:*

" 'GENTLEMEN—This morning I received from Mr. Harding the inclosed papers, 'a day after the fair.' What do they mean? I have never heard of the reference to Wait for an accounting with Reeve,—supposed it still stood on the report of Chase. What is the significance of this notice, and Harding's insinuation that his interests and mine are henceforth in conflict? I shall be greatly obliged to you for information in the matter.
" 'Yours very truly,                JOSHUA STARK.'

"To this letter McCoy & Pratt wrote the following reply:

" 'CHICAGO, *September 1, 1879.*

" *'Joshua Stark, Esq.:*

" 'Yours of the 29th of August received in due time, and we have been trying to post ourselves as to the status of affairs since Judge Farwell referred the telegraph case to H. L. Wait, master, to make a report of the Reeve accounting. Some of the exceptions to Chase's report were sustained, but it is no doubt the programme to have an account again reported in favor of Reeve, about equal to the Chase report, and an order made to sell out the company and its assets to pay the claim out of the proceeds. Of course, Reeve or his attorney, in that case, would be able to outbid all others. Harding, no doubt, has an arrangement with Sutherland to pool in with him, and then hold the property for sale subject to the Western Union Telegraph Co. There is a new company expected to reach this city. Their object, no doubt, is to be ready to sell to this new company. It appears to be a rival of the Western Union Telegraph Co., from Baltimore. Yes, that inclosed notice was the first intimation we had of this accounting. John I. Bennett seems to be interested with the parties running this accounting. What do you think? Would not any sale made under the Reeve claim and accounting be subject to the trust deed securing our bonds? In other words, must not parties desiring title be compelled to go to the deed of trust? If you have any plans please communicate. We would like to co-operate with you.

" 'Yours very truly,    McCOY & PRATT.'

"Stark was now fully advised of the state of proceedings. As to whether he came to Chicago before September 20, 1879, the record is silent.

"September 16, 1879, Sutherland served notice on Harding that he, Sutherland, would ask, on Saturday morning, September 20, 1879, for the confirmation of master Wait's report, and for a decree in favor of Reeve based upon the report. This notice was sent to Stark. September 20, 1879, Stark càme to Chicago, talking with Sutherland, who let the matter of the entry stand over, at Stark's request, till the next Monday or Tuesday. Stark then saw Wait, Whiton and McCoy & Pratt, and

also the receiver.   What further notice could have been given?

"September 23, 1879, McCoy & Pratt wrote to ascertain what Stark had done, as follows:

" 'CHICAGO, *September 23, 1879.*
" '*Joshua Stark, Esq., Milwaukee, Wis.:*

" 'DEAR SIR—We see that the report of master was this morning confirmed in the telegraph case.   What arrangement, if any, did you make in the matter?   Please advise us by return mail, as we do not want to be entirely left in the cold. We want to go in with you, if possible.

" 'Yours truly,                   McCOY & PRATT.'

"To this letter Stark replied as follows:

" 'MILWAUKEE, WIS., *September 24, 1879.*
" '*Messrs. McCoy & Pratt, 151 Monroe St.:*

" 'GENTLEMEN—In reply to yours of the 23d.   I made no arrangement relative to my bonds, but suppose the question of their amount, holders and validity will come before the court upon a reference, when all holders can present their bonds and have them allowed.   I did not learn just what the scheme for the sale of the lines is.   My chief concern was for my friends in Milwaukee.   I found that, since the funds in the receiver's hands were exhausted, no one has been willing to defend the company or even advise me what was required, so it happened that I was, for the first time, to learn last Saturday of Judge Farwell's decision of the new reference and its terms, and of the need of funds to secure representation.   The notice first forwarded by Mr. Harding was blind.   I did not understand it, and I got no explanation until I consulted the documents in the clerk's office.   It is now too late to avert the Reeve calamity. I have no funds for the purpose, and there is now no time to raise them.   I do not think it is quite the fair thing to leave me so utterly in the dark respecting this litigation, especially in view of my double relation as counsel and officer.   Do you?

" 'Yours respectfully,                   JOSHUA STARK.' "

However it may have been that others were interested as counsel, it is apparent from all the evidence that Harding was one of the counsel of record, had not withdrawn as such, and continued to accept notices, and not until October, 1879, did he give notice that he would no longer

accept notice as counsel and had ceased to act as such. The notices that were given by Sutherland were given to Harding as counsel for the corporation, were accepted by Harding as such counsel, were acted on by court and master as evidence of service on the corporation, and it must be held that Harding was the counsel of the corporation of record at that time, and from the evidence in this record we are unable to find any satisfactory evidence of a service upon any one else than Harding by Sutherland. Harding occupied the relation to the corporation, in the record, as counsel, which was not severed, as appears from the evidence, until after this contract was consummated, and he continued to receive notices in reference to the notices in the litigation of the corporation, without informing the masters before whom references were pending or giving information to the courts entering orders therein. This action of Harding was in line with the agreement in his contract, and was the carrying out of one of the early steps necessary to be accomplished in wrecking the corporation, and rendering necessary the call on the stockholders to pay assessments on their stock.

Shortly after the decision of this court in the *Terwilliger case* Reeve's cross-bill had been filed, and the corporation had, by its petition, sought to have an accounting with Reeve, which latter petition was early referred to Chase to make his report and state the account between Reeve and the corporation. By Reeve's cross-bill the new matter for accounting brought into the record mainly consisted of his claim for the construction of 1400 additional miles of telegraph lines. During the pendency of the hearing before Chase on this petition, evidence was heard and a report made by him as to not only the construction of the lines completed and uncompleted, as mentioned in the opinion in the *Terwilliger case*, but evidence was heard and report made of all the work done by Reeve subsequent thereto, including that of the 1400

additional miles of telegraph line. From the time of filing the cross-bill, and during the pendency of the accounting before the masters on the various orders of reference, Reeve's cross-bill was without an answer, and no steps appear to have been taken to have one filed thereto. The contract of June 18, 1879, had on that cross-bill a re-animative effect, and it was aroused from its lethargic state by Sutherland delivering, on September 16, 1879, a copy of a notice to the clerk of Harding, at the office of his firm, that an order on the defendants to answer that cross-bill by September 19, 1879, had been entered; and following that order a default of the defendants to the cross-bill and a decree confirming the report of Wait, as master, was entered, which decree is substantially as broad as warranted by the allegations of the cross-bill. The manner of securing the report of the master and that decree we have already discussed.

The efforts made by this corporation to defeat Reeve's claim, and its efforts to set aside the claims of Gage, Hilton and the bank, had been rendered nugatory by its own counsel, Harding, in conjunction with Sutherland, who had, from the inception of this litigation, been constantly opposed to the corporation. Not only that, but the receiver in the later litigation had been represented, where he was a party, by Sutherland, and was to look to Sutherland, Harding and Bennett for counsel, but mainly relied on Sutherland for that purpose. From the claims of Gage and the bank springs the interest acquired by Gray and Mrs. Sutherland. Sutherland was attorney for the receiver, yet for Gray he purchased, at a great discount, the claim now held which Gray acquired from Gage in this matter, and the claim of Adelaide K. Sutherland was purchased by Sutherland from the Commercial National Bank, and the claims of Hilton, the bank and Gray all had their origin in the transaction by which Otis, as treasurer, executed notes of the corporation to make payments to, or as evidence of indebtedness of,

that corporation to Reeve, for work performed under his contract, which was set aside as fraudulent by this court in the *Terwilliger case.*

The claims all now being allowed and a decree of confirmation entered, the first purpose of the contract was accomplished, and to accomplish it these parties had deliberately agreed to treat as erroneous and set aside a decree of the court in a cause where the corporation was a party and its stockholders had vital interests, and they and it were not represented or their interests protected by counsel.. Having accomplished their purpose to this extent, they next proceeded to the despoilment of the corporation and the sacrifice of its property. To accomplish this, the bank, Hilton, Sutherland and Harding, claiming to represent a majority, in interest, of all the creditors of the company, presented a petition asking for a sale of all its property, which petition was verified by Sutherland, and a decree was entered granting the prayer of that petition, and Wait, as master, ordered to make that sale. Preparatory to the sacrifice of this property the receiver had been induced to make a lease of the property for a term of five years, and from the record the conviction forces itself upon us that in the execution of the lease and its transfer to the trustee of the men who concocted this scheme, the purpose was to create an incumbrance on the property and prevent *bona fide* bids therefor by disinterested parties.

At the sale, Whiton, as trustee, became the purchaser of all the property of the corporation for the sum of $15,000, and the purchase price was credited on the claims of the purchasers. Having thus acquired the property, which was held by their trustee, it was all transferred to the American Union Telegraph Company for the price and consideration of $40,000, which sum was distributed in accordance with the June 18 contract. Having exhausted the assets of the company, and an assessment having theretofore been made for a call on

the stockholders, they, in accordance with the June 18 contract, attempted to provide for the collection of these calls. Gray was a stockholder. He was also the owner of the Gage claim, and evidently, after a consultation with Sutherland and in accordance with a previous agreement, he became the defendant in a suit and went to Sutherland's office, where he consulted with Eric Winters, as his attorney. He allowed a friendly suit to be brought in a county in which he did not reside, and Sutherland paid his attorney for services. A demurrer having been sustained to the declaration and an appeal prosecuted, Sutherland, the attorney for the appellant, paid for printing the briefs to be filed by the appellee. When the judgment of the circuit court was affirmed by the Appellate Court an appeal was prosecuted to the Supreme Court, where the judgment was reversed and remanded.

The contract signed by Gray in his subscription for stock, as quoted in *Great Western Telegraph Co.* v. *Gray, supra,* is identical with that herein above quoted. The declaration in that case was alleged by the defendant, in his demurrer, to not state a good cause of action for the following reasons: "First, that the contract of the defendant therein set forth is a limited contract, and provides for the payment by the defendant of forty per centum of the par value of the shares subscribed for by him, and no more—that he paid said forty per centum, and is not liable to pay any further sum; second, that the plaintiff's right of action against defendant on said contract is barred by the Statute of Limitations; third, it does not appear by the declaration that the defendant was a party to the proceeding in the circuit court of Cook county, wherein the assessment was ordered." And it was held in that case: "This Great Western Telegraph Company was organized in the year 1867, under the law of 1849, in relation to telegraph companies. The suit in chancery wherein this receiver, Bowen, was appointed and this assessment made, was commenced in 1869, and

has ever since been pending, so that it was not affected by the act of 1872, and the provisions of that act did not govern the proceedings therein." And it was further said: "That suit was brought by one Terwilliger and certain other persons, stockholders of the company, on behalf of themselves and all others similarly situated, against the company and others, as defendants. The declaration in the present case avers, and the order of assessment appearing therein sets forth, that the receiver was appointed in the said chancery suit, of and for the company and all its property, on October 7, 1874, upon supplemental bill of complaint filed therein, and on account of the mismanagement and malfeasance of the then officers of the company."

From these extracts it is apparent the allegations of that declaration were that the appointment of the receiver was made under the original bill of Terwilliger and the supplemental bill thereto, which was a misstatement of the facts and an effort to procure a decision by misleading as to the facts. As has already been stated, the Terwilliger bill contained no averments of indebtedness or allegation to authorize the court to appoint a receiver for the company. The bill filed by Jones and others, which was termed by the stipulation a supplemental bill, was in no sense of that character. The stipulation on its face shows that it was entered in that case as the basis of an interlocutory decree, and that the bill filed by stockholders was not filed for the purpose of giving the court jurisdiction to make an assessment against the stockholders.

It does not appear that Terwilliger was a party to the Jones bill, nor did he sign the stipulation, nor become a party to it in any way. That bill, therefore, was neither a supplemental bill nor an amendment to the original bill. It was, therefore, to all intents and purposes, and in law, an original bill, which did not relate to any matter already litigated by the same parties or their repre-

sentatives, nor was it an addition to or a continuance of
the scope and purpose for which the original Terwilliger
bill was filed. So far as the appointment of a receiver
was concerned, under the litigation herein mentioned, it
was as by a new suit with new parties. (*Phelps* v. *Illinois
Central Railroad Co.* 94 Ill. 548; *Chicago and Northwestern
Railway Co.* v. *Jenkins*, 103 id. 588; *Dunphy* v. *Riddle*, 86 id.
22; *Crowl* v. *Nagle*, id. 437; *Clark* v. *Manning*, 4 Ill. App.
649.) The application for appointment of a receiver com-
ing thus for the first time into the case, it would, as a
matter of pleading, be then first applied for. Such being
the case with reference to that feature, the time of filing
that pleading would fix the time of the commencement
of the suit with reference to that fact, and under the
authorities last above quoted, an amendment introducing
new parties or setting up new matter is, as to the matter
thus set up and the parties thus introduced, the com-
mencement of a suit.

On the petition of the receiver, entered October 16,
1879, an order was entered authorizing the collection of
unpaid balances from stockholders who had not paid
forty per cent of the par value of their stock. On April
10, 1886, Bowen, as receiver, filed his petition for an
assessment against the stockholders, and that petition is
entitled in the *Terwilliger case*, the *Jones case* and in Reeve's
cross-bill. On July 10, 1886, a decree was entered in
accordance with said petition which was purely *ex parte*,
and neither the decree entered thereon, nor the petition,
mentions the preceding order of assessment of October
16, 1879.

It was held in *Chandler* v. *Brown*, 77 Ill. 333, that it
would not admit of argument that a stockholder could
be concluded by any proceedings under section 25 of the
present chapter on corporations, unless he was made a
party thereto, as he had a substantial interest therein and
was entitled to his day in court. In *Lamar Ins. Co.* v. *Gulick*,
102 Ill. 41, it was held that where a stockholder was not

a party to a proceeding for the appointment of a receiver, or for an order of court making an assessment on shares of stock, no order could be entered that would be obligatory on him.  He is a necessary party to the proceeding before he is concluded by either the appointment or assessment.  Section 25 of the act of 1872, in reference to corporations for pecuniary profit, was under consideration in each of the above cases.  In *Richardson* v. *Akin,* 87 Ill. 138, it was expressly declared that the provisions of that section, so far as it relates to the liabilities of stockholders, being in conflict with the act of 1857, the latter was thereby repealed, and that, so far as the remedy against corporations or stockholders was concerned, the provisions of section 25 of the act of 1872 apply to corporations organized under prior laws.  In *Low* v. *Buchanan,* 94 Ill. 76, the provisions of the act of 1872, in reference to making directors liable for allowing the debts of the corporation to exceed its capital stock, were held to apply to directors of a corporation organized under the act of 1857.  In *Harper* v. *Union Manf. Co.* 100 Ill. 225, the provisions of the act of 1857, in reference to the liability of stockholders thereunder, were before the court, and it was broadly intimated that "we are also inclined to think that the provisions of the act of 1857, upon which the claim rests, were superseded and became inoperative by reason of the general law of 1872 upon the same subject; but we find it unnecessary, in disposing of this case, to adjudge that question."

Such being the rule declared by this court with reference to the act of 1872, so far as remedies have been provided under that act and a construction thereof given, what is said in the opinion in the *Gray case,* viz.:  "In order for the board of directors to have made a valid order for payment, it would not be contended, we presume, that defendant should have been before the board. No more, we conceive, was it necessary that defendant should have been before the court, when it, in place of

the directors, made the call or order of assessment,"—was not said in construing the act of 1872, but the general rule and practice in such cases, as they existed before that act, were under discussion, and the manner in which the case was presented to the court by the declaration, which misstated the facts, as appears by the quotations from the opinion in the *Gray case* heretofore made, caused the court to hold the order of assessment of 1886 valid and the stockholders not necessary parties thereto.

Without in any manner changing what is said in the *Gray case*, on the facts there appearing we hold that all the proceeding, so far as it affects stockholders who were not parties thereto, is invalid, and in like manner is the order of assessment of October 16, 1879, similarly not binding on those who were not parties thereto.

The provisions of section 25 of the Corporation act are applicable to all proceedings in this cause subsequent to the decree of November 16, 1872, on the original Terwilliger bill, so far as an assessment on the stockholders was concerned. The averments of the declaration in the *Gray case*, as the same are to be gathered from that opinion, were that the appointment of the receiver and the assessment were made under the Terwilliger bill and a bill supplemental thereto. This was not the case, however the order may have been entitled. The appointment of the receiver and the assessment were made on the Jones *et al.* intervening bill, which was filed long after the act of 1872 was in force and applicable thereto.

When the *Terwilliger case* was before this court, in the opinion rendered, wherein the circuit court was ordered to enter a decree, among the directions was the following: "Unless such newly elected board shall make an amicable settlement with Selah Reeve, and one satisfactory to the court, it will ascertain, as nearly as possible, the cost of the line constructed or partially constructed by him, and, after allowing him such cost and a reasonable compensation for his time and labor, will enter a

decree against him for any excess of money he may have received from the company, to be paid to the treasurer appointed by the new board of directors." The order of reference of March, 1873, required the master to state the account between the company and Reeve of all money, notes, stock or other property of the company received by Reeve, his agents, trustees or other employees, etc. When the December 26, 1874, report of Chase was made on the Reeve claim, he held that Reeve was not to be charged in the accounting with anything he did not personally receive, and treated the amount of $151,550.90 as having been adjudicated by the opinion in the *Terwilliger* case, and found the costs of the work done prior to June 30, 1870, to be $91,090, and on that basis the balance found due Reeve was $55,958.99. By sustaining certain exceptions to the report, Judge Farwell held that the master should report not only the amount received by Reeve, but also that received by his trustees, agents or employees. This decision of Judge Farwell was in strict accordance with the order of reference, and was in accordance with the requirements of justice. By the evidence in this record Reeve had subscribed for 117,897 shares, and transferred the same to Snow, as his trustee, to sell the same, all of which was assented to by Gage, as president of the corporation, and Snow was authorized to appoint agents or employees to sell that stock, and all the number of shares of stock subscribed for by Reeve, and which are not now held by him, were disposed of by Reeve, his trustee, agent or employees, and to the extent that any money was received by any of them Reeve must be held accountable, and in stating the account he should be charged therewith.

By the *Terwilliger* case, and the decree of the circuit court in compliance therewith, the contracts between Reeve and the corporation for the construction of the lines were set aside and declared void, and the corporation was required to issue certificates of stock to all sub-

scribers entitled thereto by reason of their subscription for the Reeve stock under the contract quoted in this opinion, and that a meeting of stockholders should be called for an election of a new board, etc. The questions before the court in that case were presented by stockholders who sought to set aside the contract between Reeve and the corporation and have certificates issued to themselves, that they might have a voice in its management, and this is substantially the extent to which the opinion in the *Terwilliger case* goes, except as to the directions to the circuit court. The subscriptions of Gage, Hasbrouck Reeve, Snow, Johnson, Hall, Gardner and Selah Reeve were declared void no further than requiring certificates of stock to be issued to *bona fide* subscribers who became purchasers of the Reeve stock, and each of these first subscribers to that stock, under every principle of law, is liable for the amount of his subscription except where in good faith disposed of to others, in the manner found by the Terwilliger opinion; and it appearing that Reeve still holds stock, and is insolvent, if anything is found due him on final accounting, payment should be required of him, and anything found due him should be set off against his liability as a stockholder.

The claims of Hilton and of the Commercial National Bank had been reduced to judgments at law. Hilton's claim was recovered by service on Gage, as president, and the company suffered a default. By the bill which was dismissed, as hereinbefore stated, these claims, together with those of Gage and others, were in litigation, and if the averments of that bill were true, then all claims sought to be contested by it should, in view of the circumstances under which it was dismissed, be allowed to be contested, on a re-reference of the cause, to the extent that it was sought to be done by that bill. It appears that Harding received the notice, on September 17, 1879, that a motion would be made to dismiss the bill, and accepted service thereof, and not until October 3, 1879,

did he in any manner indicate that he was no longer the attorney of the corporation, at which time he indorsed a notice served on him, "I am no longer an attorney in the above case, and represent no one but myself," and to allow the dismissal of this suit to prejudice the rights of stockholders or the corporation would be unconscionable.

The contract of June 18, 1879, heretofore discussed, was carried out, in almost all its parts, by the successive steps following its execution, and the final step was to be the making of the collections from the stockholders, authorized by the assessment order of 1886, and the relation of the parties to the contract, and their subsequent action, must be considered together. Harding's relation as attorney of the corporation, and Sutherland's relation as attorney for the receiver and also for himself and Adelaide K. Sutherland and others, and the relation of others signing that contract who had claims which were then being litigated, and their conspiring to accomplish the end of having claims allowed with which to charge the corporation and sell the lines and make the assessment, constituted the purposed acts a contemplated fraud and the consummated act a real one. The contract was fraudulent *per se*, and the execution of its terms was a fraud, not only as to the corporation, but as to the receiver and the stockholders.

The claim of Reeve, as presented to the master and finally confirmed by the court, we have already stated to be a fraud on the master and court alike. By the express provisions of the contract the decision of Judge Farwell was to be treated as error and contemptuously disregarded, and Hilton, Gray and the Commercial National Bank, with Whiton, as trustee, conspired to accomplish this end with Sutherland and Harding, and sell the property of the corporation and collect from stockholders. The objects and aims of each and all were alike fraudulent toward the corporation, the receiver and the stockholders. Reeve, Hilton and the Commercial National

Bank, with Gage, Snow and Otis, were defendants to the bill which was filed by the Great Western Telegraph Company, which alleged the judgments in favor of the bank and Hilton, and the notes on which they were based, should be vacated and canceled and enjoined from collection, and that Gage should be required to pay the same. By the contract this bill was to be dismissed, in accordance with the following clause: "And all suits on behalf of said company now pending against any of the parties hereto shall be at once dismissed." Under such circumstances the receiver should be permitted to introduce any evidence that could have been introduced under that bill which sought to challenge these claims, and show why they should be vacated as judgments and canceled. The report of the master on this point should have been approved and the cause referred for that purpose, and the assignees of the claims thus sought to be challenged should occupy no better position in the final determination thereof than that occupied by the original creditors.

The claim of Bennett, who was a party to that contract, was transferred to John J. McClellan, and the claim of the Commercial National Bank was purchased for Adelaide K. Sutherland by her husband, who had full knowledge of all that was done, and Mrs. Sutherland must be held to the knowledge possessed by her agent.

The claims of Hilton and the bank, and that held by Gray, as assignee of Gage, had been reduced to judgments against the corporation, and were sustained by that high evidence, and the facts alleged in the bill which was thus dismissed in pursuance of the contract, might have been set up in defense by the corporation against those judgments at law, by motion to set aside those by confession and for leave to plead. We hold these claims must be allowed to stand as proven, but as the bill of the corporation was filed for the purpose of vacating and setting aside these claims, the receiver should hereafter, on a re-reference of this cause, be per-

mitted to offer any evidence to show they were fraudulent and void that might have been offered under the original bill filed by the Great Western Telegraph Company.

It is urged, however, that all the matters averred in this bill have been adjudicated and determined in *Bates* v. *Great Western Telegraph Co. supra.* The bill in that case, and the demurrer thereto, are made a part of this record, and we have given the same patient and careful examination. The averment in the Bates bill as to the June 18 contract is as follows: "And your orators further show, that on or about the 18th day of June, 1879, the said company then being in the hands of its receiver appointed as aforesaid, or his successor, and the aforesaid claims, or a large portion thereof, being then pending and disputed by the said company, by its counsel, and the said tangible property having been bargained but not yet sold, and being about to be sold, at the sale above mentioned, for $15,000, so that said property and assets would be exhausted as aforesaid, the said Great Western Telegraph Company and its solicitors in said cause, together with the counsel of said Reeve, (who had previously assigned his claim to his said counsel,) and the said claim being then pending and undetermined to a very large amount, to-wit, $154,000 or thereabouts, and up to that time having been disputed by the company, entered into a certain fraudulent and corrupt agreement, to the effect that all opposition to said pending claim should be withdrawn by the company, and that the same should be immediately allowed for their full amount, and that an assessment should be procured to be levied by this court upon the stockholders of the said company for the deficit after applications of the said proceeds of such sales, and your orators show that said agreement was carried out by the parties thereto, and the said company and its counsel at once abandoned all opposition to the said claims, including that of said Reeve, and that they were accordingly allowed the full amount as claimed,

the said company permitting itself to be defaulted upon the cross-bill of said Reeve filed against it in said cause, and the said agreement was further carried out by the parties thereto by procuring the said Bowen to be appointed receiver in said cause, for the purpose of filing and prosecuting a petition for the assessment of said stockholders upon their aforesaid contracts with said Reeve in the manner above stated, which petition was prepared and filed and is the *ex parte* petition aforesaid."

No copy of the agreement is attached to that bill, and the theory of that bill was, that the order of assessment was procured by a suppression or concealment from the court of what were termed the Reeve contracts, and those contracts were the contracts executed in 1868, and which are by the court in that opinion described as follows: "The contracts and other instruments heretofore referred to as executed in 1868 will be designated, for the sake of brevity, as the Reeve contracts. Is there anything in the Reeve contracts which can change or vary the liability of a subscriber to the subscription paper above set forth, as we have decided such liability to be in the *Gray case?* We think not." After fully discussing the facts and referring to the previous decisions the court said: "We are therefore of the opinion that it would have been the duty of the circuit court to enter the orders of assessment if the Reeve contracts, which are alleged to have been concealed from its notice, had been brought to its attention and had been fully considered in connection with the subscription papers. As the only fraud charged consisted in the alleged suppression of those contracts, and as their production could not have changed the result, the demurrer to the bill was properly sustained."

The June 18 contract, as attempted to be pleaded in that bill, had not sufficient of its terms averred to bring it before the court, and because of insufficient averment of fraud it was not discussed. It cannot be said that it

161—38

was pleaded in that bill. The manner of setting up the proceedings under which the assessment was made on which the proceedings were had which resulted finally in the opinion in the *Gray case* by this court, and the manner of pleading the June 18 contract in this bill, are materially and vitally different from what was pleaded in the Bates bill. Under the pleadings as presented in the *Bates case* we adhere to what was said in the opinion in that case.

The manner of the appointment of the receiver, and the pleadings under which it was done, the assessments of 1879 and of 1886, and the misstatements of facts in the declaration in the *Gray case,* and the manner in which the June 18 contract is pleaded and set out, are before this court for the first time in this bill; and as that June 18 contract is the centripetal point around which these ingenious frauds revolved and which made them possible and is pleaded in this original bill, and it is shown that the complainants had no knowledge of its existence until about one month prior to the filing of the bill, the case is for the first time presented for adjudication on these questions in a suit by stockholders, or the corporation, or the receiver.

The *Bates case* was disposed of upon a demurrer, which specially set out the causes. The rule is well settled that a judgment upon a demurrer, by reason of a defective pleading, is not a bar to another action founded upon the same cause that is well pleaded, and there is no inexorable rule which requires a plaintiff, when his declaration shall be adjudged defective on demurrer, to ask leave to amend, or, as a penalty, to forfeit all future right upon the same cause of action not set forth in a defective declaration, even though it was attempted to be well stated, —and the same principle applies to a bill in equity as in a declaration at law. To cite authorities to sustain that proposition would be a work of supererogation. The matters set up as constituting fraud in this bill, which

were not pleaded in the bill in the *Bates case,* render this case so materially different from the *Bates case* that the latter cannot be considered as *res judicata* of the matters averred in this bill of complaint.

Nor can *laches* be imputed to these complainants who had no knowledge of the June 18 contract until about one month prior to the time of filing their bill in this cause.   It was of such a character that the parties to it would be induced to conceal it on every principle of self-interest and care for their reputation for honesty; and the strenuous efforts of counsel for complainants in this cause to produce the original or to account for it, their final resort to a copy, and the laborious attempts of the parties to that contract to exclude the copy, are evidence of the difficulty with which these complainants were confronted in obtaining knowledge thereof.   Neither is there evidence in this record of any facts known to complainants which would put them on inquiry.   In *Michoud* v. *Girod,* 4 How. 503, it is said:  "In general, lapse of time is no bar to a trust clearly established to have once existed, and where fraud is imputed and proved, length of time ought not to exclude relief.   *   *   *   Within what time a constructive trust will be barred must depend on the circumstances of the case.   There is no rule which excludes the consideration of circumstances, and in a case of actual fraud we believe no case can be found in the books in which a court of equity has refused to give relief within the lifetime of either of the parties upon whom the fraud is proved, or within thirty years after it has been discovered or becomes known to the party whose rights are affected by it."   In *Henry County* v. *Winnebago Drainage Co.* 52 Ill. 299, it was said:  "There are cases in which courts of equity will interpose to prevent the bar of the Statute of Limitations, as in cases of a fraud which has not been discovered until the statutory bar would ordinarily apply at law.   The fact that the statute is positive in its terms will not, under all circum-

stances, operate as a bar in equity. There are cases in which a court of equity will not permit the bar of the statute to be interposed against conscience, and it will supply and administer a remedy within its jurisdiction, and enforce the right for the prevention of a fraud." In *Greenman* v. *Greenman,* 107 Ill. 404, it was said: "The Statute of Limitations does not strictly apply to cases in equity, but equity generally follows the law, and denominates the period that the statute requires to bar an action, *laches,* that renders a demand stale."

With reference to whether a cause of action is barred in equity, the rule may be stated, that where a cause of action arises from a fraud, the Statute of Limitations will not begin to run nor *laches* apply until the discovery of the fraud, or from the time when the fraud could have been discovered by the exercise of reasonable diligence; but in the latter case the failure to use diligence is excused where there is a relation of trust and confidence, rendering it the duty of the party committing the fraud to disclose the truth to the other. *Caswell* v. *Caswell,* 120 Ill. 377; *Sloan* v. *Sloan,* 102 id. 581; *Jones* v. *Lloyd,* 117 id. 597; *Harris* v. *McIntyre,* 118 id. 275; *Vigus* v. *O'Bannon,* id. 334; *Reynolds* v. *Sumner,* 126 id. 58; *Whitlock* v. *McClusky,* 91 id. 582; *Prevost* v. *Gratz,* 6 Wheat. 481; *Gillett* v. *Wiley,* 126 Ill. 310.

It is urged that the agreement between Sutherland and Collins & Burgie operated as a release to them, and it is also insisted that the June 18 contract, which provided that Harding and Bennett should release certain stockholders by name or residence, as mentioned therein, operated as a release of all other stockholders. We do not deem it necessary to enter into a discussion as to the effect of a release, or a covenant not to sue. The most that can be held with reference to the agreement between Sutherland and Collins & Burgie is, that it amounted to a covenant not to sue, being made direct to them. Those mentioned by name or residence in the June 18 contract,

who were sought to be protected by Bennett and Harding, are not parties to an agreement that would enable them to plead the same, and it must be held there was no such mutuality between them and the signers to the contract as created a covenant amounting either to a release or a covenant not to sue.

On the evidence in this record with reference to the sale of the lines of the Great Western Telegraph Company, which were purchased by Whiton, as trustee, under the June 18 contract, and under the facts surrounding the re-sale to the American Union Telegraph Company, the amount paid by the latter company should be held to have been paid to Whiton in trust for the Great Western Telegraph Company, and when apportioned by the trustee, as provided by the June 18 contract, it was done in the accomplishment of a common design, for a common benefit, by the parties to that contract, and the apportionment being by one selected by them for that purpose, the parties to the scheme by which the property of the corporation was thus sold, sacrificed and the proceeds distributed, should, for the amount thereof, be held jointly liable. "The rule is firmly settled that where a breach of trust has affected two or more trustees with a common liability, they are liable jointly and severally. Each is liable for the whole loss sustained or the whole amount due, and a decree against them jointly may be enforced against any one or more of them." (Pomeroy's Eq. Jur. sec. 1081.) In *Attorney General* v. *Wilson*, 1 Cr. & Ph. 27, it was urged that as the injury had arisen from the misconduct of certain wrongdoing trustees, a suit could not be sustained against part of them only, and the court said: "In cases of this kind, where the liability arises from the wrongful act of the parties, each is liable for the consequences, and there is no contribution between them, and each case is distinct, depending on the evidence against each party. It is therefore not necessary to make all parties who may, more or less, have joined in the act

complained of, nor would any one derive any advantage from their being all made defendants, because, as the decree would be general against all found to be guilty of the charge, it might be executed against any of them." In Bump on Fraudulent Conveyances, 572, it is said: "There is no instance of any reimbursement or indemnity afforded by a court of equity to a *particeps criminis* in a case of positive fraud. No right can be deduced from a fraudulent act. Every one who engages in a fraudulent scheme forfeits all right to protection, either at law or in equity. The law does not so far countenance fraudulent contracts as to protect the purchaser to the extent of his instrument. This doctrine is supported by every principle of morality and justice, as well as by principles of sound policy. No party should be permitted to join in a conspiracy to cheat another with impunity."

Where a liability arises from an intentional wrongful act of several parties conspiring together, each is liable for all the resultant damage, and there can be no contribution between them. Nor is it necessary to make parties defendant all who may have joined in the act; nor would it create any right of contribution between them, as each is alike liable for the loss sustained by such wrongful act. A conspiracy by which several wrongfully obtain the property or money of another and misappropriate it, is not to be distinguished, in the joint and several liability of each, from a trespass in which all are alike guilty and jointly and severally liable for the damage sustained. The master, in this case, found that the amount received by these several parties, with interest from the date of the sale by Whiton, November 27, 1880, was $61,146.28, and recommended that a decree be allowed jointly against Harding, Sutherland and Gray for that amount. The peculiar facts of this case, however, where the amount recovered is to be mainly distributed among persons who were parties to the June 18 contract, or their privies, on claims which were allowed where the corpo-

ration was a party before the execution of that contract, induce us to make this an exception to the general rule. We have heretofore stated in this opinion the amounts received by the various parties to the June 18 contract from the proceeds of the sale of the lines. Of those who received a part of the proceeds of this sale, only Sutherland, Harding and Gray are before the court on the record. They each should be compelled to account for the amounts respectively received by them, with six per cent interest per annum thereon from November 27, 1880. The master's report finding that a joint decree should be entered against them was properly disapproved. The court should, however, have found against the three last named parties these respective amounts, with interest as above stated. The sum so stated, when recovered, should be held the property of the corporation, and distributed as the same may be hereafter determined.

The claim of Harding had been allowed, and was undisputed until after the June 18 contract, and it cannot be said, from the evidence in this record, that the confirmation of the report allowing his claim should be set aside, yet the evidence discloses that $500 was paid him in 1878, no bill being rendered, and on a re-reference of the cause there should be an accounting showing the amount of money paid him, etc.

The claim of Bennett, now held by John J. McClellan, was not in any manner challenged or disputed before the June 18 contract, and was allowed, and if either Harding, Bennett or John J. McClellan has received any money in excess of the amount of the claims, a decree against them severally should be made.

The evidence reported by the master does not show the actual purchases of claims, or their character or amounts, against the corporation by Thomas J. Sutherland. But, as hereinafter determined, he could not be permitted to act as attorney and receive compensation therefor. His interest in claims proven and allowed, and

purchased by him, should be permitted to stand unless where attacked by the bill of the Great Western Telegraph Company dismissed as stated, but an account should be had as to the moneys received by him and the claims owned by him, etc.

The jurisdiction of a court of equity is such that it may always grant relief against judgments and decrees obtained by fraud, and will be exercised to prevent the enforcement of a judgment or decree which is against conscience, or where a party had no opportunity to defend, or was prevented by accident or the fraud or improper management of the opposite party, and is without fault on his part. (*Carrington* v. *Holabird,* 17 Conn. 530.) In *Johnson* v. *Waters,* 111 U. S. 640, it was said: "The most solemn transactions and judgments may, at the instance of the parties, be set aside or rendered inoperative for fraud. The fact of being a party does not estop a person from obtaining, in a court of equity, relief against fraud. The court of chancery is always open to hear complaints against it, whether committed *in pais* or in or by means of judicial proceedings. In such cases the court does not act as a court of review, nor does it inquire into any irregularities or errors of proceeding in another court, but it will scrutinize the conduct of the parties, and if it finds that they have been guilty of fraud in obtaining a judgment or decree, it will deprive them of the benefit of it, and of any inequitable advantage which they have derived under it." Here a judicial decision was deliberately disregarded which was beneficial to the corporation and its stockholders and adverse to Reeve.

In *Wadhams* v. *Gay,* 73 Ill. 415, the following quotation is made with approval from *Jenkins* v. *Robinson,* 1 H. L. Cas. 117, decided in 1867: "In my opinion *res judicata* signifies that the court has, after argument and consideration, come to a decision on a contested matter. Here the court exercised no judicial function on the subject.

It has merely exercised an administrative function by recording the *interlocutor* which had been agreed to between the parties." The opinion in the *Wadhams case* then proceeds: "In *Edgerton* v. *Muse*, 2 Hill, (S. C.) 51, an application by petition, before the decree of sale was executed, to correct an error in the decree in including a wrong piece of property in the property partitioned, O'NEALE, J., said: 'I think the court must exercise the right of correcting its decrees in *ex parte* cases and cases by consent, so long as they remain unexecuted, for although they purport to be the act of the court, and, as such, have legal effect, yet in point of fact they are the mere act of the parties. Neither the facts nor the law can be said to be judicially ascertained in such a proceeding. The only restriction upon the exercise of this power ought to be the execution of the decree. It is then that the decree ought to be regarded as final and to be an estoppel between all parties and privies.' These judicial utterances are quoted, not as authority for disturbing anything which has been done, but as illustrative of the nature of judgments by consent as differing from judgments *in invitum*, and the extent to which they may be deemed to partake of the character of the party's own act of agreement."

In *Earl of Bandon* v. *Becher*, 3 C. & F. (H. L. Cas.) 479, it was said: "A sentence is a judicial determination of a cause agitated between real parties, upon which a real interest has been settled. In order to make a sentence there must be a real interest, a real argument, a real prosecution, a real defense, a real discussion. Of all these requisites not one takes place in the case of a fraudulent and collusive suit. There is no judge, but a person invested with the insignia of a judicial office is mis-employed in listening to a fictitious cause proposed to him. There is no party litigating, there is no party defendant, no real interest brought into question."

The hearing on the Reeve cross-bill related to a matter that it had been agreed should not be contested between

Sutherland and Harding,—one representing Reeve, the other accepting notice as and for the corporation. Their agreement was to accomplish that end. The confirmation of the master's report was by and in accordance with that previous agreement, and there was not a real controversy of a real interest by real parties on real evidence, but a proceeding to mislead master and judge alike, and induce what was not a real report or a real decree. It was such fraud that the decree of confirmation of the Reeve claim must be set aside and the report disapproved. It was, in effect, a finding by the master, and a decree, by consent, and they were so nearly the mere acts of the parties that it cannot be said the facts or law were judicially ascertained. It is a maxim of equity that where one comes into a court of chancery and asks relief he must come with clean hands, and relief cannot be extended to aid in the accomplishment of a wrong, neither can it be extended to one who is not willing to do equity.

Under section 25 of the act entitled "An act concerning corporations," no assessment can be made against a stockholder unless he is a party to the suit, where it is sought on the part of a receiver, and it may only be done in equity; and some of these claims having been fraudulently allowed, in pursuance of the terms of this agreement, and the property of the corporation disposed of in like manner, a court of equity should not relieve any of the parties to that agreement of June 18, 1879, but should leave them in the position in which they have placed themselves by their agreement, and not seek to afford them equitable relief by an assessment on the stockholders. The report of the master on this question should have been approved.

Ordinarily a stockholder has no control over a suit against a corporation by a third party, nor is such stockholder, as a general rule, the representative of the corporation. The corporation is represented by its officers,

who, in legal contemplation, are all-sufficient for the protection of the interests of that body.   In support of this well known proposition numerous authorities are cited by counsel for the defendants.   Without entering into a discussion of the authorities cited, it is sufficient to say we concur with them on that·question.

Counsel for defendants also urge that, a receiver having been appointed for the corporation, he succeeds to all the rights of the corporation, and it is his duty to collect and preserve the funds, and all rights of action in respect thereto are vested in him, and he cannot be sued except on permission of the court appointing him.   To each of these propositions counsel for the defendants refer us to numerous adjudged cases establishing these principles.   Here again we deem it unnecessary to comment upon those cases, as the propositions above stated are well-recognized rules.   But to each of the above propositions there are exceptions recognized by the courts and the profession, rendered necessary by the varying circumstances surrounding the diversified business interests, and the ingenuity of the human mind in devising expedients for accumulating money.   Avariciousness and frailty, weakness and viciousness, are not always circumscribed within established rules, and to control these, exceptions to such rules are also recognized and established.

But counsel for the defendants insist, and it is urged, that appellants, as stockholders of the Great Western Telegraph Company, have no right to institute an action in their own names to accomplish the purpose sought by this bill, claiming that that can be accomplished only by an action by the corporation in its name or that of the receiver, and that until the latter has been requested to bring the suit, and has refused so to do, the stockholders cannot be allowed to invoke protection; and it is also urged that the various bills, petitions, etc., hereinbefore mentioned, are still pending, and that any proceeding taken should be by motion or intervention therein.

Equity does not require a particular person or class of persons to be complainants, but only requires that all having an interest in the subject matter which entitles them to be heard shall be made parties; and whilst, ordinarily, the corporation is the representative of the stockholders for the purpose of protecting and enforcing its corporate rights, yet when the corporation actually or virtually refuses or neglects to protect its rights, the interest of the stockholder is not to be sacrificed because thereof, and he may seek relief in equity.

In *City of Chicago* v. *Cameron*, 120 Ill. 447, it was said: "Generally it is so, that actions to obtain relief against wrongful dealings with corporate property by directors and officers must be brought by and in the name of the corporation; yet courts of equity recognize that the stockholders are ultimately the only beneficiaries, and there are well recognized cases in which a stockholder may individually bring suit. The doctrine is laid down by Mr. Pomeroy in his work on Equity Jurisprudence, (vol. 3, page 10,) as follows: 'Wherever a cause of action exists, primarily in behalf of the corporation, against directors, officers and others, for wrongfully dealing with corporate property or wrongful exercise of corporate franchises, so that the remedy should regularly be obtained through a suit by and in the name of the corporation, and the corporation, either actually or virtually, refuses to institute or prosecute such a suit, then, in order to prevent a failure of justice, an action may be brought and maintained by a stockholder or stockholders, either individually or suing on behalf of themselves and all others similarly situated, against the wrongdoing directors, officers and other persons; but it is absolutely indispensable that the corporation itself should be joined as a party—usually as a co-defendant.' The author proceeds afterward to state wherein the corporation's refusal to prosecute may be virtual, and is not required to be actual in order for a stockholder to sue, as, where

there is a reasonable certainty that a demand for a suit by the corporation would be nugatory; that in such case the stockholder may bring the suit without first having requested the managing body of the corporation to do so."

In *Robinson* v. *Smith*, 3 Paige, 222, it was said: "Generally, where there has been a waste or misapplication of the corporate funds by the officers or agents of the company, a suit to compel them to account for such waste or misapplication should be in the name of the corporation. But as this court never permits a wrong to go unredressed merely for the sake of form, if it appeared that the directors of the corporation refused to prosecute by collusion with those who had made themselves answerable by their negligence or fraud, or if the corporation was still under the control of those who must be made the defendants in a suit, the stockholders, who are the real parties in interest, would be permitted to file a bill in their own names, making the corporation a party defendant, and if the stockholders were so numerous as to render it impossible or very inconvenient to bring them all before the court, a part might file a bill in behalf of themselves and all others standing in the same situation."

In *Peabody* v. *Flint*, 6 Allen, 52, the following principle was stated as the contention of the defendants: "The principal ground of demurrer relied on by the defendants is, that the plaintiffs have not, and never had, any remedy for such injuries as they complain of; that, conceding the truth of the allegations that the directors of the Salem and Lowell Railroad Company, either by themselves or with the consent and connivance of a majority of their stockholders, combined, either among themselves or with the Lowell and Lawrence Railroad Company or its directors, or with any of the other defendants, to defraud a minority of the stockholders of the Salem and Lowell Railroad Company, and in pursuance of this combination did the acts alleged, and so dealt and managed

as to destroy the value of the stock as set forth, yet the only relief which the minority can have is the very imperfect one of selling out their stock for what it will bring in market." This was repudiated by the court, and it was said: "If there is an equitable interest, there must result from it equitable relations and equitable rights, and these rights may be enforced by equitable remedies. As between the corporation itself and its officers, it was long since held that they were trustees, and that a court of equity would hold them responsible for every breach of trust. The corporation itself holds its property, as trustee, for the stockholders, who have a joint interest in all its property and effects, and each of whom is related to it as *cestui que trust*. The corporation may call its officers to account if they willfully abuse their trust or misapply the funds of the company, and if it refuses to sue, or is still under the control of those who must be made defendants in the suit, the stockholders, who are the real parties in interest, may file a bill in their own names, making the corporation a party defendant, or a part of them may file a bill in behalf of themselves and all others standing in the same relation, if convenience requires it. If other parties have participated with the officers in such proceedings, they may, according to the established principles of equity pleading, be joined as parties. In the discovery of frauds, and in furnishing remedies to parties defrauded, equity does not suffer technicalities to stand in its way, but seizes upon the substance of the case and holds all parties to their just responsibility, following trust property into the hands of remote grantees and purchasers who have taken it with notice of a trust, in order to subject it to the trust." To the same effect and sustaining the same view are *Hersey* v. *Veazie*, 24 Me. 12; *Hodges* v. *New England Screw Co.* 1 R. I. 312; *March* v. *Eastern Railroad Co.* 40 N. H. 548; *Heath* v. *Erie Railway Co.* 8 Blatch. 347; *Bjorngaard* v. *Goodhue County Bank*, 49 Minn. 483.

The principle is well sustained by authority, that where a corporation is under the control of defendants who must be sued to assert a right, and a suit is brought by a stockholder for that purpose, and he shows a reason and excuse for bringing it in his own name, that is equivalent to a refusal of the corporation to act in bringing the suit, and the stockholder may maintain his action without showing such request and refusal. *Wheeler* v. *Pullman Iron and Steel Co.* 143 Ill. 197.

The position occupied by the receiver of a corporation is somewhat different from that of the officers of a corporation, who act as trustees for the stockholders. The weight of authority is that a receiver stands more in the relation of trustee for both creditors and shareholders, and the principle is well stated by High in his work on Receivers, (sec. 314,) where it is said: "As regards the relation occupied by the receiver of an insolvent corporation toward the parties in interest, the better doctrine undoubtedly is that he stands as a representative both of the creditors of the corporation and of its shareholders. He is not, therefore, the agent or representative of the corporation exclusively, but is to be regarded as a trustee for both creditors and shareholders." And the position of a stockholder, where there is a receiver, is such that a greater reason exists for allowing the stockholder to institute a proceeding against the receiver than against the corporation itself.

In *Brinkerhoff* v. *Bostwick*, 88 N. Y. 52, it was said: "In the present case the corporation cannot sue because all its rights of action have been transferred, by operation of law, to the receiver. He certainly is not a proper person to whom to intrust the conduct of the action, even did he consent to institute it or should the comptroller of the currency direct him so to do, for he is one of the parties charged with misconduct and against whom a remedy is sought. It necessarily follows that the shareholders must be permitted to sue in their own names, or

the wrongs complained of must go without redress and substantial rights be sacrificed to a mere matter of form. The shareholders are the parties whose interests are involved in the proceeding. If conducted in the name of the corporation or the receiver it would be as their representative and for their benefit, and when, as in this case, sufficient reasons are shown why it cannot be effectually prosecuted in that form, the right of the shareholders to sue in their own names is sanctioned both by principle and precedent." And whilst this latter case was one in which a receiver had been appointed by the comptroller under the National Bank act, yet it was held that the right of action was not derived from the act of Congress, but depended upon general principles of equity.

In *Hightower* v. *Thornton*, 8 Ga. 486, it was said: "It is reported to have been said by Lord HARDWICKE in an anonymous case, (2 Atk. 15,) and in *Jones* v. *Jones*, 3 Atk. 111, that a bill in chancery is never dismissed for want of parties, but that it stands over on the payment of costs. And this, no doubt, is true, with this qualification: provided the necessary parties can be made, for if it is apparent that this cannot be done, and there can be no decree without them, as is sometimes the case, the bill, of course, must be dismissed. We entertain no doubt but that this proceeding could be maintained by a creditor directly in his own name—that the right exists independent of any statutory enactments; but the legislature having ratified the appointment of receiver in this case, on whom, as standing in the place of directors, *pro hac vice*, this duty would legitimately devolve of calling in the unpaid stock to satisfy the outstanding debts of the company, we think the suit should be prosecuted in his name, unless some sufficient excuse is rendered why it is not, as, that he has fraudulently combined with the stockholders, as the directors were charged with having done in the case cited from Connecticut, and as they are alleged to have done here, during the continuance of the

charter, respecting the five per cent installment, or that he has failed or refused to take the proper steps to have this and the other demands due by the company extinguished out of the assets of the company. In such event the assignee should be made a party defendant."

In *Monitor Furnace Co.* v. *Peters*, 40 Ohio St. 575, it was said: "It is the right and duty of the receiver of a dissolved and insolvent corporation to pursue and recover property which has been fraudulently conveyed before the dissolution. We do not, however, agree with the plaintiffs in error in their proposition that he is the only party who can do this. In March, 1876, the Monitor Furnace Company, as a corporation, was dissolved, and Shaw was appointed its receiver, to administer its estate, under the direction of the court, for the benefit of the creditors and stockholders. On the 20th day of May, 1876, it is claimed that the company sold and conveyed all its valuable property for the purpose of defrauding creditors. More than two years passed without any steps being taken by the receiver looking toward the setting aside of this sale and the saving of this property for the benefit of creditors. In 1878, Isaac Peters, a judgment creditor of the Monitor Furnace Company, commenced a proceeding to set aside the alleged fraudulent sale and conveyance, and in the court having control and direction of the receiver. To this proceeding the receiver and all parties in interest were made parties defendant and were brought into court. In such an action as this the court could make the proper order as effectively and justly as if it had been instituted by the receiver. The proceeding was, in substance and effect, an application to the court to direct the receiver to do his duty, and we think can be maintained."

*Halsey* v. *Ackerman*, 38 N. J. Eq. 501, was a suit in equity by a stockholder and creditor against the directors of a corporation for which there was a receiver, who was likewise a defendant, and the bill was sustained. A case

analogous in principle was before this court in *Preston* v. *Spaulding*, 120 Ill. 208, where, in stating the theory of the case, it was said: "At the very threshold of the court he concedes the right, and asserts, inferentially, the duty, of the assignee to sue for and recover, in his name and character of assignee, everything belonging or appertaining to the estate of his assignors. That such is the right and duty of the assignee admits of no doubt. Section 11 of the Voluntary Assignment act is both his warrant and mandate. But while this is so, it is also true that the assignee takes the estate assigned, in trust, to administer and apportion among the creditors of the assignors, and upon his neglect or refusal to take the proper proceedings to protect the trust estate, or, as in this case, to reduce it to possession and gain its control, the right of the creditors (*cestuis que trust*) to come into a court of equity to assert their rights and protect their interests cannot be denied."

As in the case of stockholders against a corporation, on principle and authority it must be held that the same right exists on the part of a stockholder to maintain his action against the receiver and the corporation and others, to assert a right in which he has an interest, without a request on the receiver to bring such suit and his refusal to do so, where the stockholder shows by his bill what is equivalent to a refusal on the part of the receiver to bring the action. When this bill was filed the corporation and the receiver filed their demurrer thereto, and subsequently the receiver answered, acting by Thomas J. Sutherland, his solicitor. During a period of about nine years he made no effort to recover the money derived from the sale of the corporate property effected through the June 18 contract, and made no effort to prevent the dismissal of the bill which sought to challenge the correctness of claims against the corporation, and through all the long controversy over the Reeve claim, of which Sutherland had become the assignee, the re-

ceiver steadily adhered to Sutherland as his counsel, and was apparently guided and controlled by him. The property of the corporation had passed from its control, and it existed in name merely, and no election for directors or other officers was held after the election of 1874. The corporation had practically ceased to exist, and could act only through its receiver. From all the circumstances appearing in this record a request on the part of a stockholder to the receiver to bring the suit would have been idle, as he, in the discharge of his duties, was apparently, from the time of his appointment, only to be aroused by the voice or pen of Sutherland. The fact of the receiver retaining as his counsel the largest creditor of the corporation and the assignee of the claim, was a circumstance which, of itself, was a sufficient excuse for these stockholders not to place their interests, or a suit to protect such interests, in the control of the receiver alone. This principle is substantially sustained by what is said in *Adams* v. *Woods*, 8 Cal. 306, *National Bank of Detroit* v. *Kent*, 43 Mich. 292, and *Covey* v. *Long*, 43 How. Pr. 492. The principle is also well stated by Gluck & Becker in their work on Receivers of Corporations (pp. 414, 415): "And·it has been held that if a receiver, for an unreasonable length of time, refuses to institute proceedings for the purpose of setting aside a transfer and sale of the property made by the corporation itself, through a resolution of its board of directors, for the purpose of defrauding creditors, a party interested may commence a proceeding, making the receiver a party, to set aside the alleged fraudulent sale, in the court having control and direction of the receiver, without a previous request on the latter. In such an action the court can make the proper judgment as effectually and justly as·if it had been instituted by the receiver."

The proceeding is, in substance and effect, an application to the court to direct the receiver to do his duty. If the receiver is one of the parties charged with mis-

conduct and against whom a remedy is sought, he is certainly not a proper person to whom to intrust the conduct of the action, even did he consent to institute it; and it necessarily follows that the parties interested should be permitted to sue in their own names, without demand upon and refusal by the receiver to sue. Any other alternative would result in wrongs complained of going unredressed and substantial rights becoming lost through a mere matter of form. For courts to hold that suits could not be maintained except by the receiver would be *ovem lupo committere.* Where, as here, the receiver's interest is hostile to that of the stockholders, and where he persistently employs as counsel one whose interests are hostile to the corporation and to the stockholders, and there are circumstances indicative of fraud on the part of the receiver, an original bill in the nature of a bill of review may be filed by stockholders, for in such case he may be thus required to do his duty.

The objection that leave to sue the receiver was not first had is not sustained by the facts. To the original bill, as filed, Edwin R. Bowen was made a party defendant, but Elias R. Bowen, the receiver, was not made a party. After the bill was filed, on October 22, 1888, an application was made, by motion, for leave to amend that bill, and the following order was entered on the date last mentioned: "On motion of complainants it is ordered that leave is hereby granted the complainants to amend their bill of complaint herein by changing the name of Edwin R. Bowen to Elias R. Bowen, and by making Elias R. Bowen, receiver, a party defendant." This order, by its express terms, is permission to sue the receiver.

On August 2, 1883, Thomas J. Sutherland filed his petition for an allowance for fees against the Great Western Telegraph Company, which was referred to the master, who made his report, and on September 26, 1883, an order was entered confirming the report of the receiver, and decreeing that Sutherland have and recover from the

Great Western Telegraph Company $10,096, and order-
ing payment of the same. The schedule attached to that
petition covers a period of time from May 1, 1879, until
about the time of the filing of that petition. The master
finds that that has been in part paid, and by the bill in
this case it is asked to have that order set aside and its
collection enjoined. It is a rule of a salutary character
that a receiver cannot be permitted to employ as his
counsel one who is engaged by another party to the pro-
ceeding, and whenever the relations of such counsel are
hostile to another party to the proceeding wherein the
receiver must act, it cannot be tolerated that the re-
ceiver may employ such hostile counsel. It is said in
High on Receivers (sec. 216): "The receiver should not
employ the counsel of either of the parties to the litiga-
tion in which he was appointed, since their duty being
to protect the interests of their respective clients and
to watch the receiver's proceedings, to the end that a
faithful performance of his duties may be insured, they
are not regarded as competent to act as counsel for the
receiver, and their undertaking to act in such a capacity
might frequently cast upon them inconsistent and con-
flicting duties, which could not properly be discharged
by one and the same person." The same principle is
announced in Edwards on Receivers, (p. 93,) and is sus-
tained by *Adams* v. *Woods, National Bank of Detroit* v. *Kent,*
and *Covey* v. *Long, supra.*

The order, as entered in Sutherland's favor for these
fees, was against the corporation, and the receiver was
ordered to pay the same. Technically this order is erro-
neous on its face, for legal services to a receiver do not
create a liability against the corporation, although it
may be paid out of its assets. But, disregarding that
technical error, we hold it is the duty of courts of chan-
cery to strictly enforce the principle, clearly established,
that a receiver will not be permitted to employ as his
counsel one whose interests, in person or as attorney for

another, are hostile to the interests represented by and the duties of such receiver, and it being the duty of the attorney to know the law in that behalf, it was his duty to decline to accept employment by the receiver, and doing so and seeking to act on both sides, with such hostile interests, is fraud, and the order of September 26, 1883, allowing fees to Sutherland as attorney for the receiver must be set aside.

In this discussion we now approach a question which, of those in this record, has been attended with the most serious difficulty. The *Terwilliger case,* with the accompanying involved pleadings, being still on the docket as a pending cause, it is urged that if the various orders and decrees we have herein set forth were improvidently made, they were of an interlocutory character, and stockholders, though not parties by name to that suit, are yet in such relation to it that they might intervene, and by petition in that case apply to the court before which that cause was pending to modify or vacate them, and that an original bill in the nature of a bill of review will not lie.

In *Sheldon* v. *Fortesque,* 3 P. Wms. 104, decided in 1731, it was held by the lord chancellor: "I admit, even a decree,—much more an interlocutory order,—if gained by collusion, may be set aside on a petition; *a fortiori* may the same be set aside by bill." But in *Mussell* v. *Morgan,* 3 Brown's Ch. 65, decided in 1790, where a petition was filed in a cause to have a decretal order set aside, Lord Chancellor THURLOW refused the prayer of the petition, saying there was no instance hitherto of its being done, and he could see no reason why it should not be by original bill in the nature of a bill of review. "Either there is enough before the court already for it to determine upon, or not. If there is, it may be done by rehearing; if not, the new matter must be brought before the court."

In *Manton* v. *Molesworth,* 1 Eden, 18, it was said: "The objection to this relief is, that the plaintiff must bring a bill of review on matter existing before and discovered

since the hearing. But I am of opinion that method would not have been his proper method. This is not a case to which that remedy is applicable. A bill of review with matter coming to the party's knowledge after the hearing, lies where the plaintiff in the bill has, since the hearing, discovered matter which would vary the decree, and where, if such matter was known to the other party, he was not, in conscience, obliged to have discovered it to the court, for if the matter was known to the other party, and such as, in conscience, he ought to have discovered, he obtains the decree by fraud, and it ought to be set aside by original bill.—*Vide, Kennedy* v. *Daly,* 1 Sch. & Lef. 355."

In discussing questions of pleading it is said in Story's Equity Pleadings, (sec. 426): "Fourthly, bills impeaching decrees for fraud. A bill of this sort is an original bill in the nature of a bill of review. There is no doubt of the jurisdiction of courts of equity to grant relief against a former decree where the same has been obtained by fraud and imposition, for these will infect judgments at law and decrees of all courts, but they annul the whole in the consideration of courts of equity. This must be done by an original bill, and there is no instance of its being done by petition, although it seems once to have been thought that a decree, as well as any interlocutory order, could be set aside, for fraud, by petition only. Where a decree has been so obtained the court will restore the parties to their former situation, whatever their rights may be. This kind of bill may be filed without leave of the court being first obtained for the purpose, the fraud used in obtaining the decree being the principal point in issue, and being necessary to be established by proof before the propriety of the decree can be investigated."

In *Griggs* v. *Gear,* 3 Gilm. 2, it was said: "There is another sort of bill for opening and reversing a decree in the same court, very nearly allied to a bill of review,

the object of which is to impeach the former decree by fraud. This is an original bill in the nature of a bill of review, and is a matter of right, and may be filed at any time without the leave of the court. This bill may be brought for fraud in fact or fraud in law. (Cooper's Eq. Pl. 96.) * * * It is not infrequently the case that one bill partakes of the character of several of these and other bills. * * * So, also, of necessity, may a bill be filed seeking the reviewal and reversal of a former decree, partaking both of the character of a bill of review for errors apparent, and of an original bill in the nature of a bill of review seeking to reverse a former decree for fraud, both of which may be filed without the leave of the court."

In *Erie Railway Co.* v. *Ramsey*, 45 N. Y. 637, it is said: "Nor is it without other precedent that a court of equity, by action instituted before it, may question the proceedings in another court of equity. Thus one court of equity has overhauled the decree of another court of equity for fraud, contrivance or covin in the obtaining of it. (*Bandon* v. *Becher*, 3 Clark & Fin. 479; *Manton* v. *Molesworth*, 1 Eden, 25.) If it may entertain an action for that purpose in which its decree, if favorable to the moving party, will have the effect to forever restrain the execution of the decree the validity of which is brought in question, why may it not, pending the suit before it, restrain, by temporary injunction, the execution and enforcement of that decree? If it may thus restrain the proceedings in another court of equity to enforce the decree of that court, may it not restrain the proceedings in that court to obtain the decree? We speak of it, not as a power usually to be exercised, but as one not beyond the jurisdiction of the court. The affirmative answer to this question is found in the fact that it has done so." In support of such proposition the following authorities are cited: *Jackson* v. *Leaf*, 1 Jac. & W. 229; *Clarke* v. *Ormonds*, Jacob, 546; *Earl of Newberry* v. *Wren*, 1 Vern. 220; *Vendall*

v. *Harvey*, Nelson, 19; *Joanes* v. *Whiting*, Cary, 161; *Booth* v. *Leycester*, 3 Myl. & C. 459; *Beckford* v. *Kemble*, 1 Sim. & Stu. 7; *Crawford* v. *Fisher*, 10 Sim. 479; *Schuyler* v. *Pelissier*, 3 Edw. Ch. 191; *Beauchamp* v. *Huntley*, Jacob, 546.

It has been held in numerous cases that a court may grant an injunction to restrain parties to another action in the same court, and this though it was objected that the same relief could be had in the original action, where the parties were the same, which was still pending in the same court. *Sieveking* v. *Behrens*, 2 Myl. & C. 581; *Warrington* v. *Wheatstone*, Jacob, 202; *Prudenhal, etc.* v. *Thomas*, L. R. 3 Ch. Div. 74.

On principle and authority it must be held that, in a case demanding it, jurisdiction exists in a court of equity to grant an injunction in one action to affect the proceedings in another action already pending in the same court, whether they be actions at law or in equity. Without again reciting any of the complicated pleadings or facts of this record, we hold that, on principle, where the complexity of the facts and pleadings are such in a pending case in equity that to afford relief new parties and much additional new matter must be alleged, there is no general unlimited proposition that the court has no jurisdiction to entertain a new bill for relief. The jurisdiction existing to entertain such bills for relief, we further hold that the bill filed in this case as an original bill in the nature of a bill of review, to impeach, for fraud, certain orders and decrees in the pending cases in this bill mentioned, was within the jurisdiction of the court, and relief should be granted thereon where the facts in the record warrant it, and that it may be filed without leave of court first had. (Mitford's Eq. Pl. 112.) We also hold that the decree on the Reeve claim, as allowed and written out, and the attack on the claims sought to be made by the bill of the Great Western Telegraph Company against Gage, Reeve, Hilton, the bank and others, were matters so adjudicated that to have the

relief here prayed for an original bill was necessary, and when filed for that purpose the ancillary jurisdiction in equity would give jurisdiction to review and consider all the other matters in this bill averred. It was proper for the court to entertain this bill, and the demurrers were properly overruled.

It is further urged, that, even if the bill is otherwise maintainable, the creditors of the corporation are indispensable parties, as one of the objects of the bill was to set aside the decree of assessment by which their debts were to be paid. It is said in High on Receivers (sec. 265): "Where persons apply for and obtain leave of court to bring an action against a receiver in his official capacity, it is not essential to the jurisdiction of the court over the receiver, or to the validity of the order, that the application should be based on notice to the parties in the action wherein the receiver was appointed. It is sufficient that leave be granted by the court having control over the receiver, on notice to him against whom the proceedings must be brought." This principle is sustained by *Potter* v. *Bunnell,* 20 Ohio St. 150. We have discussed the circumstances under which a receiver may be sued without leave. When sued, notice to creditors is not indispensable, as he stands in the relation of trustee. The relief sought is from an act resulting from the action of the receiver in procuring the assessment, to which the creditors and stockholders were not parties, and to undo that act, where it was improperly obtained, does not require as indispensable parties the creditors. The rights of creditors would remain the same, to have an assessment properly made, if they, through the receiver, proceed in a proper manner.

It is insisted, further, that the alleged agreement was, at most, but an unexecuted intention, and to charge that the agreement was made, etc., does not amount to an allegation of fraud, and that the bill contains no charge of fraud well pleaded. Counsel cite numerous authorities

on the question, among others *People* v. *Healy*, 128 Ill. 9, where it is said: "Even if, at the time they were made, it was not intended to comply with them, it was but an unexecuted intention, which has never been held, of itself, to constitute fraud." The principle is so familiar that fraud must be averred by an allegation of facts which renders the necessary or probable inference to be that fraud is committed, that it is unnecessary to discuss that further.

The actual accomplishment of the acts proposed and contemplated by the agreement fortifies the evidence and becomes persuasive that the contract was in fact executed. In the early history of this corporation, in its first litigation before this court, in the *Terwilliger case*, Chief Justice LAWRENCE, who wrote the opinion, was constrained to say of it: "The scheme is only a new variety of the many joint stock enterprises through which artful and unprincipled men, by the use of specious names and pretexts, so often enrich themselves at the expense of the innocent subscribers to their stock. When they are brought within the jurisdiction of the courts, it is at once a duty and a pleasure to give whatever protection may be possible to their victims." If that designation of its original purpose be correct, and this corporation had its origin in conspiracy, then, in truth, the successors in trust to the original founders have, by their conduct, furnished ample evidence of heredity. The story of this litigation, as told in this record, is the narrative of the incertitude of human actions, which requires the greatest power of the courts to control and govern. This litigation has lived through term after term of the circuit judges of Cook county and has witnessed the changes of the members of this court, and with its recurring appearance there come greater ills to be cured, and their cure is sought by those who were the early victims, and who in this case have brought themselves within the jurisdiction of the court in such a manner that they should be allowed a hearing

an'd have a day in court. That has finally been assured them, and to them and the defendants alike have we given a patient, careful, cautious study of the record and the questions of law as presented here.

We have endeavored to discuss all the questions raised by the different counsel, and to consider all the material facts in this voluminous, intricate and involved record, and are of opinion that the court erred in sustaining the exceptions to the report of Boyesen, master, in this case, and in dismissing the bill. We have, as we discussed questions, given directions as to the decree and reference. A motion having been entered at a former term to have the judgment in this case entered *nunc pro tunc* as of the March term, 1893, at which it was taken, and to be so entered because of the death of certain parties to the record, the judgment of the Appellate Court for the First District and the decree of the circuit court of Cook county will be reversed and the cause remanded for further proceedings not inconsistent with this opinion, and this judgment will be entered *nunc pro tunc* as of the March term, A. D. 1893.     *Reversed and remanded.*

Afterward, upon rehearing, the following additional opinion was filed:

Per CURIAM: A rehearing having been granted in this cause, on further consideration of the same it is determined that the opinion heretofore filed, modified as it is herein, is ordered re-filed as the opinion of this court in this cause.     *Reversed and remanded.*

Mr. JUSTICE BAKER: In my opinion there should have been a decree for the $61,146.28 against Sutherland, Harding and Gray, jointly, as recommended by the master. In all other respects I concur in the opinion of the court.